# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2013-KA-00977-COA

**THOMAS PUSTAY A/K/A THOMAS STEPHEN PUSTAY A/K/A THOMAS STEPHAN PUSTAY**                    **APPELLANT**

v.

**STATE OF MISSISSIPPI**                    **APPELLEE**

| | |
|---|---|
| DATE OF JUDGMENT: | 05/11/2007 |
| TRIAL JUDGE: | HON. STEPHEN B. SIMPSON |
| COURT FROM WHICH APPEALED: | HARRISON COUNTY CIRCUIT COURT, FIRST JUDICIAL DISTRICT |
| ATTORNEY FOR APPELLANT: | OFFICE OF STATE PUBLIC DEFENDER BY: GEORGE T. HOLMES |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL BY: LAURA HOGAN TEDDER |
| DISTRICT ATTORNEY: | JOEL SMITH |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| TRIAL COURT DISPOSITION: | CONVICTED OF COUNTS I AND II, GRATIFICATION OF LUST, AND SENTENCED TO FIFTEEN YEARS ON EACH COUNT; COUNTS III AND V, SEXUAL BATTERY OF A CHILD AT LEAST FOURTEEN BUT UNDER SIXTEEN YEARS OF AGE, AND SENTENCED TO TWENTY-FIVE YEARS ON EACH COUNT; AND COUNT VI, SEXUAL BATTERY OF A CHILD UNDER EIGHTEEN YEARS OF AGE, AND SENTENCED TO TWENTY-FIVE YEARS, WITH THE SENTENCE IN COUNT III TO RUN CONSECUTIVELY TO THE SENTENCE IN COUNT II, AND WITH THE SENTENCES IN ALL OTHER COUNTS TO RUN CONCURRENTLY WITH ONE ANOTHER, ALL IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS |
| DISPOSITION: | AFFIRMED - 10/04/2016 |

MOTION FOR REHEARING FILED:
MANDATE ISSUED:

**BEFORE GRIFFIS, P.J., CARLTON AND WILSON, JJ.**

**CARLTON, J., FOR THE COURT**:

¶1.     Thomas Pustay appeals his conviction of two counts of the crime of touching a child for a lustful purpose and three counts of the crime of sexual battery.  After our review of the record, we find no error by the trial court.  As a result, we affirm Pustay's conviction and sentence.

**FACTS**

¶2.     On May 11, 2005, Jane,[1] Pustay's biological niece and his adopted daughter, reported alleged sexual abuse by her father to an official at her school. At the time she reported the abuse, Jane was in the eleventh grade.[2]  Jane then met with Pass Christian Police Chief John Dubuisson and Assistant Chief Tom Ruspoli.  Jane informed them that Pustay, who was a chief investigator with the Pass Christian Police Department, began inappropriately touching her around the fifth grade.  The touching escalated into sexual intercourse that lasted from the sixth grade to the eleventh grade, or two weeks prior to her report.

¶3.     Chief Dubuisson and Assistant Chief Ruspoli also interviewed two of Jane's friends, Ashley Stephens and Magan Helveston.  Ashley told the police that Jane came to school upset, and Ashley encouraged Jane to tell the school officer about Pustay's abuse.  After speaking with Jane and her friends, Chief Dubuisson and Assistant Chief Ruspoli determined

---

[1] Due to the nature of the crimes and the age of the victim, we use a fictitious name.

[2] Jane was eighteen and in the twelfth grade when the trial occurred.

2

the alleged acts occurred outside of the city and turned the investigation over to Investigator Carolyn Prendergast with the Harrison County Sheriff's Office.

¶4. Investigator Prendergast transported Jane to the Child Advocacy Center, where an advocate interviewed her while Investigator Prendergast watched from a separate room. Investigators also transported Jane to Memorial Hospital for evaluation, but due to the length of time between the last reported sexual encounter and the examination, a rape kit was not performed.

¶5. On the same day as Jane's report, Investigator Prendergast interviewed Karen Pustay, Jane's adoptive mother and Pustay's wife, who told investigators that Pustay admitted the sexual abuse to her. Jane was then removed from the home and placed in foster care. While in foster care, Jane attempted to have the charges dropped but refused to admit the allegations were false.

¶6. A Harrison County grand jury indicted Pustay on February 6, 2006. After a trial held on May 7, 2007, the jury found Pustay guilty of five of the six counts in the indictment. On May 21, 2007, the trial court sentenced Pustay to serve a total of forty years in the custody of the Mississippi Department of Corrections (MDOC). On May 25, 2007, Pustay timely filed a motion for a new trial or, in the alternative, a judgment notwithstanding the verdict (JNOV). A year later, on May 16, 2008, Pustay filed a pro se motion to dismiss. Then, five years later, on February 25, 2013, Pustay filed a pro se motion for a new trial.

¶7. The trial court judge who presided over Pustay's trial failed to rule on his posttrial motions. After waiting six years to receive a ruling on his posttrial motions, Pustay filed a

3

pro se petition for mandamus with the Mississippi Supreme Court on June 10, 2013, to require the trial court to render a decision. On June 25, 2013, the Clerk of the Mississippi Supreme Court issued a letter to the trial-court judge now assigned to the case, who had been appointed to the position after the trial, and asked for a response. On July 25, 2013, the trial-court judge entered an order denying Pustay's posttrial motions. Pustay then filed his pro se notice of appeal.

¶8.     On appeal, Pustay asserts thirteen separate assignments of error. We have edited and reordered the issues for clarity: (1) whether the trial court erred in allowing the State to treat its own witness as hostile and establish its case through impeached testimony; (2) whether the trial court erred in limiting Pustay's cross-examination of a State's witness; (3) whether the trial court improperly limited Pustay's testimony; (4) whether the trial court erred in denying Pustay's motion to review the records of relevant youth-court proceedings; (5) whether Pustay's indictment was insufficient and vague, rendering it defective; (6) whether the trial court erred in its *Batson* analysis and in placing jurors stricken by Pustay back onto the jury; (7) whether the trial court erred in admitting irrelevant and prejudicial evidence of Pustay's character in violation of Mississippi Rule of Evidence 404(b); (8) whether the trial court erred in excluding relevant and probative evidence under Mississippi Rule of Evidence 412; (9) whether the trial court erred in admitting improper lay-opinion testimony; (10) whether Pustay received constitutionally ineffective assistance of counsel, which resulted in prejudice; (11) whether the lesser-included count of Count II, lustful touching, merged with Count VI, sexual battery; (12) whether the evidence was sufficient or whether the verdicts

4

were supported by the weight of the evidence; and (13) whether cumulative error requires reversal.

## DISCUSSION

**I.      Whether the trial court erred in allowing the State to treat its own witness as hostile and establish its case through impeached testimony.**

¶9.      Pustay claims the trial court committed reversible error during the State's interrogation of Karen. Specifically, Pustay claims that it was error for the trial court to admit Karen's recorded statement to police officers as part of the State's impeachment of her testimony.

¶10.      The standard of review for "a trial court's admission or exclusion of evidence is abuse of discretion." *Carothers v. State*, 152 So. 3d 277, 281-82 (¶14) (Miss. 2014) (citing *Osborne v. State*, 54 So. 3d 841, 845 (¶12) (Miss. 2011)). "Our trial judges are well-suited to make these calls" as to the admission or exclusion of prior inconsistent statements as impeachment evidence. *Id.* at 284 (¶21).

¶11.      The State called Karen to testify. Her direct examination began as follows:

Q.      Ma'am, if you could, please state and spell your name for the record.

A.      It's Karen Pustay. . . .

Q.      Ma'am, did your husband ever admit to you that he molested your daughter?

A.      No.

Q.      Did your husband ever admit to you that he sexually penetrated your daughter?

5

A.    No.

Q.    Ma'am, did your husband ever admit to you that he molested your daughter?

A.    No.

Q.    Ma'am, do your recall giving two statements to—

A.    Yes, I did. And—

. . . .

Q.    Ma'am, do you recall giving a taped statement to law enforcement officers?

A.    Yes.

Q.    And you gave that on two different occasions; is that correct?

A.    No. It was one day.

Q.    But two different sessions; is that correct?

A.    Yes.

Q.    You recall that. Would it refresh your recollection if I showed you your statements?

A.    I know what I said.

Q.    What did you say at that time, ma'am?

A.    I said that he told me he molested her, but I lied.

Q.    Ma'am, you're saying you lied to the police officers?

A.    Yes, I did. Yes. I'm sorry I did it. I'm ashamed that I did it. But I was afraid. They had me locked in a little room, and I was afraid they weren't going to let me go. And I thought if she told them that he molested her, and she loved him—

6

At this point in the examination, the State objected on the grounds that Karen's answer was not responsive. The State then asked permission to treat Karen as a hostile witness and ask leading questions. The defense objected, but the trial court granted the State's request on the grounds of Karen's "recantation under oath."

¶12. The State then continued its examination with questions about Karen, her husband, her family, and other personal matters:

> Q. And how many hours a week would you say the defendant is alone with [Jane]?
>
> A. Was?
>
> Q. Uh-huh.
>
> A. He worked too. A couple of hours.
>
> Q. Ma'am, isn't it true you told police officers, "Quite a few?"
>
> [The State then objected that the Karen's answer was unresponsive and the trial court ordered Karen to respond to the questions.]
>
> Q. So, ma'am, isn't it true when you were talking to the police officers you told them, "Quite a few?"
>
> A. I told you I lied to them about most of the stuff I said. I was scared. I wanted them to let me go. They wouldn't let me go.
>
> Q. So you're saying you lied when you told them, "Quite a few?"
>
> A. Yes.
>
> Q. Is it fair to say you're a liar?
>
> A. I lied about that. I told you I was scared.
>
> Q. Are you scared now?

A.     No. I'm under oath. I have to tell you the truth.

. . . .

Q.     Isn't it true, ma'am, that just prior to her reporting the sexual abuse, you described your relationship with her as pretty strained?

A.     Yes.

Q.     But you told police officers you'd been talking a lot more and getting along better recently?

A.     I had been trying to get along with her a lot better.

Q.     So that part of what you told the police officers was true?

A.     Yes.

Q.     And isn't it true you told them that you had been friends?

A.     We hadn't really become friends.  She still didn't trust me.  She wouldn't tell me hardly anything about her life.

Q.     Okay.  So when you told police officers you'd become friends, you were lying in regard to that?

A.     She still didn't trust me, no.

Q.     So, ma'am, when you told the police officers you'd become friends, were you telling the truth or lying to them?

A.     I lied to them.

. . . .

Q.     Ma'am, you just told this jury that when you told the police officers you-all had become friends you were lying?

A.     Yes.

Q.     So when you lied to the police and you told them that you-all had become friends, but your relationship was strained; is that correct?

8

A.    Our relationship was always strained.

Q.    Okay. And when the police officer asked you, "Do you think it's because of the molestation," what did you tell the police officer?

A.    I don't remember what I told them.

Q.    Would it refresh your recollection if I showed you your statement?

. . . .

Q.    Ma'am, I'm showing you your statement to law enforcement officers where the officer asked you, "Do you think it's because of molestation, or do you think there's other issues?" And tell the jury what you told them.

THE COURT:    You may read it, ma'am.

A.    (Reading) I think probably I'd say, I think probably, I put a lot of blame on her for that, what I thought was going on between the two. I thought they were too close, and I resented it. I think probably that is what it was, it was more my fault than her fault.

Q.    And didn't you accuse her of being too close with your husband?

A.    Accuse her?

Q.    Yes, ma'am.

A.    No.

Q.    Did you ever yell at them both for being too close, for being together all the time?

A.    I said they spent too much time together, yeah, because he took her to school every day. He brought her home. They spent time in his office together.

Q.    You weren't upset about that?

A.    I think I was kind of jealous. He was always jealous of me and my son

9

too.

Q. Ma'am, do you remember your taped statement . . . [w]hen the investigator said, "Did you ever accuse her of anything that you recall[?]" [T]ell the jury what you said at that time. It's right here, ma'am.

A. (Reading) Okay. I was mad at one time and yelled at both of them to—they was too close and they should, you know, not be together all the time. I don't know if I ever accused her, though.

Q. Ma'am, isn't it true you told police officers your marriage to the defendant had been strained?

A. Yes.

Q. And why was that, ma'am?

A. Because we weren't together too much anymore. He was always gone to work.

Q. Ma'am, isn't it true that you told law enforcement officers when you were explaining why your marriage was strained, it's because once you found out what they were doing, you'd get mad at him because he'd give her a lot of attention? He has all along. Isn't that what you said?

A. He's always given her a lot of attention. But like I told you before, I lied about most of that. I was trying to get out of that room. They kept me locked in there. They told me it was for my protection, and they wanted me to and they knew that he had molested her, and they wanted me to tell them.

. . . .

Q. And isn't it true you said you were just so naive, you were just so stupid, you should have realized what was happening?

A. I told you I lied about all this stuff because I was scared.

Q. Ma'am, you're telling me you lied about all of it, but you're saying some of it is the truth and some of it isn't. We're trying to find out for the jury what you told [that] is the truth and what you told that's not.

A.     Most of it was not the truth.  I was very scared.  I wanted to get out of there.

Then, Karen was asked about and testified in detail about the interrogation.

¶13.    At this point in her examination, the trial court judge stopped the direct examination. The trial court judge advised Karen that her testimony could subject her to prosecution for perjury and that "the Court thinks you have the right to the assistance of a lawyer at this time and that if you continue to answer these questions without the assistance of a lawyer, you do so at your own peril."  The trial-court judge concluded with: "I'm suggesting to you that if you feel like you need [a lawyer] or you feel like you need to invoke your right to remain silent, you have the right to do so."

¶14.    Karen's testimony continued:

Q.     Ma'am, isn't it true that he admitted to you he was having sex with your daughter?

A.     No.

Q.     Ma'am, I'm referring to—

A.     I know the statement.

THE COURT:     Just a minute. Ms. Pustay, let him finish his question, please.

[WITNESS]:     I don't want to read any more from the statement.

THE COURT:     You don't have that option, ma'am.

[WITNESS]:     It's not true.

THE COURT:     Answer his questions, please.

11

Q. What did you say when the officer said, "Did he admit to the first time?" It's right here, ma'am. You can read that to the jury.

A. I know I said that, but it's not true.

Q. Ladies and gentlemen—or, ma'am, tell the jury what you told the police officers.

A. (Reading) Yeah. I think he said he did molest her. He rubbed on her, is what he told me. I said it's not true.

Q. That's not what you said at that time, ma'am. Read your transcript to the jury.

. . . .

A. (Reading) Yeah. I think he did say he did molest her. Rubbed on her, is what he told me.

Q. Ma'am, isn't it true you said, "He said he did molest her. He rubbed on her, is what he told me?"

. . . .

A. I just told you I lied. That statement is mostly all a lie. I was upset. I was scared. I wanted out of there. Just made me believe if I supported her, they'd let me go home.

¶15. The State then called Officer Ron Pullen with the Harrison County Sheriff's Department. Officer Pullen was present during the interrogation of Karen. The State asked Officer Pullen about the interrogation. Then, the State offered the audio recording of Karen's first interrogation by the sheriff's department. Pustay's counsel objected on the grounds of foundation, hearsay, and relevance in addition to his continuing objections to the State's improper impeachment. The trial-court judge then said: "What hearsay? This is a taped statement between you, Officer Pullen and Ms. Pustay."

12

¶16.    Mississippi Rule of Evidence 613(b) provides that "[e]xtrinsic evidence of a witness's prior inconsistent statement is admissible only if the witness is given an opportunity to explain or deny the [inconsistent] statement."[3]    Here, the State met this predicate for admission of the pretrial statement into evidence pursuant to Rule 613(b).[4]    If a witness provides "an unequivocal or obliging admission of the prior statement," this may indeed render the statement "consistent, hence inadmissible under Rule 613(b)." *United States v. Meza*, 701 F.3d 411, 426 (5th Cir. 2012).    In this case, however, Karen did not admit to all the various factual assertions contained in her pretrial statements and her supposed admission was more of an explanation.    Instead, in her testimony, she explained and claimed that in her pretrial statements, she lied some out of fear, told the truth some, and even forgot some of the information she provided to police in her pretrial statements.    For example, she testified that she could not remember what she told police about whether her marital relationship was strained due to her husband's alleged molestation.

¶17.    In the face of Karen's unexpected testimony that some parts of her pretrial statements were true and some were not, the trial court allowed the State to cross-examine Karen in order to determine which of her pretrial statements she was claiming at trial constituted a lie. The trial court also allowed the State to cross-examine her as to her assertion and explanation that her pretrial statements were involuntary and given only out of her alleged fear and

---

[3] *See also* F.R.E. 613(b).

[4] Contrary to the specially concurring opinion, this majority opinion addresses the admissibility of Officer Pullen's testimony and the taped interview between Officer Pullen and Karen.

duress. Her testimony at trial directly contradicted the facts and circumstances of voluntariness documented in her pretrial statements. Hence, Officer Pullen's testimony and the taped statement constituted admissible impeachment evidence.[5]

¶18.   "[A] prior statement is inconsistent if under any rational theory its introduction might lead to a conclusion different from the witness's testimony." *Everett v. State*, 835 So. 2d 118, 122 (¶11) (Miss. Ct. App. 2003). The Mississippi Supreme Court has stated that "if the prior statement has a reasonable tendency to discredit the witness's testimony then the statement is considered inconsistent." *Id*. (citing *Ratcliff v. State*, 752 So. 2d 435, 439 (¶18) (Miss. Ct. App. 1999)). To be inconsistent, there must be a contradiction in fact between the pretrial statement and the trial testimony. *Ratcliff*, 752 So. 2d at 439 (¶17).

¶19.   As stated, Karen unexpectedly testified at trial that during her pretrial interviews, she told police what they wanted her to say out of fear. Karen's trial testimony further asserted that she was fearful of police because she thought that they would put her in jail. However, our review of the record shows that her pretrial statements reflect no fear, threats, or any reluctance on her part to provide information. Her pretrial statements also reflect that she was no stranger to law-enforcement officers and that her husband, Pustay, had been a law-enforcement officer at the Pass Christian Police Department for twenty-three years. Karen's first interview was conducted by Officer Kevin Fayard and Investigator Prendergast. The interview began at 3:52 p.m. and ended at 4:34 p.m. At the conclusion of this interview, Karen engaged in conversation with different officers, Officer Pullen and Major Wayne

---

[5] *See Smith v. State*, 25 So. 3d 264, 272-73 (¶¶23-28) (Miss. 2009).

14

Payne, wherein she volunteered additional information regarding the molestation allegation.

¶20.    The second interview was conducted by Officer Pullen to capture the additional information that Karen revealed in conversation with them.  The pretrial statements provided by Karen reflect no threats, reluctance on her part, or fear that the officers would put her in jail, instead of letting her leave.  Her pretrial statements even show that she planned to confront her husband face-to-face that evening when they both got home from work.

¶21.    Regarding impeachment of Karen's trial testimony about the timing of her cooperation and report, the pretrial statements reflect that she told police that she did not come forward to report the molestation earlier because "[she] was so afraid that nobody would believe what [she] said about anything."  The pretrial statements also show that the officers thanked Karen for her cooperation and expressed their appreciation for her truthfulness.  Additionally, during the second interview, the officers asked Karen if there was anything else she felt like she wanted to say so that she would not have to come back for another interview, and the pretrial statements show that the officers informed Karen that they would take her home when the paperwork was complete.  A review of the record shows that the pretrial statements directly contradict her allegations of fear she asserted in her trial testimony, and the pretrial statements also contradict her purported reasoning for the making and timing of the report.[6]

¶22.    In an analogous case, *Meza*, 701 F.3d at 426, the United States Court of Appeals for the Fifth Circuit explained that Federal Rule of Evidence 613(b) requires "that a witness have the chance either to explain or to deny the inconsistent statement before extrinsic proof is

---

[6] *See United States v. Strother*, 49 F.3d 869, 875-76 (¶¶16-18) (2d Cir. 1995).

allowed." In *Meza*, a witness similarly claimed that he provided a false pretrial statement that incriminated the defendant because he (the witness) was scared. The Fifth Circuit explained that "[t]he framers of Rule 613(b) were prudent, therefore, not to turn admissibility strictly on whether and how litigants later characterize the variability of explanations and denials." The court in *Meza* also acknowledged that a failure to remember is not an admission of the prior inconsistency and, depending on the facts of the particular case, is not a bar to admission of the extrinsic evidence of the prior inconsistent statement.[7] *Id*. at 427. The court in *Meza* found no error in the admission into evidence for the purpose of impeachment of the witness's pretrial statement that incriminated the defendant given by the witness purportedly out of fear. *Id*. at 426, 429.

¶23. Similarly, in embracing a good-faith standard for trial courts to apply in Mississippi in determining the admissibility of prior inconsistent statements used to impeach a witness, the *Carothers* court stated the following:

> We agree with this reasoning. The good-faith standard strikes a better balance between the truth-finding process at trial and ensuring a fair trial for the parties concerned. While the elements of surprise and/or unexpected hostility are (and remain) an acceptable basis for allowing a party to impeach its own witness, they are not required for purposes of Rule 607. We hold that, to prevent abuse of Rule 607, impeachment should not be allowed where the trial court finds the purported purpose of impeachment for offering the statement(s) is in bad faith, or is subterfuge to mask the true purpose of offering the statement(s) to prove the matter asserted. *See, e.g., State v. Hunt*, 378 S.E.2d 754, 758 (1989) (citing [*United States v.*] *DeLillo*, 620 F.2d 939[, 946-47 (2d Cir. 1980)]; [*United States v.*] *Webster*, 734 F.2d 1191[, 1193 (7th Cir. 1984)]). Our trial judges are well-suited to make these calls. To the extent that *Wilkins* [*v. State*, 603 So. 2d

---

[7] *United States v. Meza*, 701 F.3d 411, 426 (5th Cir. 2012); *see also United States v. Seale*, 600 F.3d 493(5th Cir. 2010); *United States v. Devine*, 934 F.2d 1325, 1344 (5th Cir. 1991).

16

309, 322 (Miss. 1992),] holds otherwise, it is overruled.

*Carothers*, 152 So. 3d at 284 (¶21).[8]

¶24. Pustay claims that the prosecutor failed to assert that the State was surprised by Karen's testimony, and thus failed to establish an evidentiary foundation for the admission of Karen's inconsistent statements. However, pursuant to the Mississippi Supreme Court's decision in *Carothers*,[9] any party may introduce unsworn pretrial inconsistent statements by

---

[8] In *Carothers*, the supreme court discussed the Seventh Circuit Court of Appeals case of *United States v. Webster*, 734 F.2d 1191, 1193 (7th Cir. 1984):

> Argument similar to Wilkins's rationale was presented to the Seventh Circuit Court of Appeals in *Webster*. Rejecting it, Judge Posner, writing for the *Webster* court, explained as follows:
>
>> Webster [(the defendant)] urges us . . . to go beyond the good-faith standard and hold that the government may not impeach a witness with his prior inconsistent statements unless it is surprised and harmed by the witness's testimony. But we think it would be a mistake to graft such a requirement to Rule 607, even if such a graft would be within the power of judicial interpretation of the rule. Suppose the government called an adverse witness that it thought would give evidence both helpful and harmful to it, but it also thought that the harmful aspect could be nullified by introducing the witness'[s] prior inconsistent statement. As there would be no element of surprise, . . . the introduction of the prior statements [would be forbidden]; yet we are at a loss to understand why the government should be put to the choice between the Scylla of forgoing impeachment and the Charybdis of not calling at all a witness from whom it expects to elicit genuinely helpful evidence. The good-faith standard strikes a better balance.

*Webster*, 734 F.2d at 1193.

[9] We recognize that although Pustay's case was tried in 2007, the relevant Mississippi authority on impeachment of testimony is *Carothers*, 152 So. 3d 277. Although the supreme court issued its opinion in *Carothers* seven years after Pustay's conviction and sentence, we

17

the party's own witness for the purpose of impeachment without having to show surprise or unexpected hostility for purposes of the rule, unless the trial court finds bad faith or subterfuge. *Id.*[10] In this case, the record shows that Karen's testimony was an unexpected surprise, and the record reflects that the trial court found no bad faith or subterfuge in the State's purpose of offering the statements for impeachment. In *Carothers*, the Mississippi Supreme Court clearly found that the trial courts possessed the discretion to make such

---

apply its holding retroactively to the present case. *See Carr v. State*, 178 So. 3d 320, 322 (¶9) (Miss. 2015); *Thompson v. City of Vicksburg*, 813 So. 2d 717, 721 (¶16) (Miss. 2002) ("[N]ewly enunciated rules of law are applied retroactively to cases that are pending trial or that are on appeal, and not final at the time of the enunciation."); *see also Beard v. Banks*, 542 U.S. 406, 411 (2004) (State convictions are final "for purposes of retroactivity analysis when the availability of direct appeal to the state courts has been exhausted and the time for filing a petition for a writ of certiorari has elapsed or a timely filed petition has been finally denied.")

[10] In *Carothers*, 152 So. 3d at 282 (¶15), the Mississippi Supreme Court held as follows:

> Rule 607 provides that "[t]he credibility of a witness may be attacked by any party, including the party calling him." Under this rule, a party may introduce for impeachment purposes unsworn pretrial inconsistent statements by the party's own witness. *Wilkins*, [603 So. 2d at 322]. Generally, because such statements are fraught with hearsay problems, they may be introduced at trial only for impeachment purposes, not as substantive evidence. *Id*. While Rule 607 makes no mention of it, this Court's precedent requires that "before a party will be authorized to introduce for impeachment purposes an unsworn pretrial inconsistent statement of his own witness," there must be a showing of "surprise" by the witness's testimony "or unexpected hostility" from the witness. *Id*. Though most other jurisdictions no longer require such a showing, primarily because they regard the requirement as an unnecessary remnant of the common-law voucher rule, which Rule 607 purportedly was enacted to do away with, Mississippi does, for reasons expressed by the *Wilkins* [c]ourt. According to *Wilkins*, "if there is in fact no surprise, the only possible motive for attempting to impeach one's own witness is to get otherwise inadmissible testimony into evidence." *Id*. at 321.

18

determinations on the admissibility of such impeachment evidence. *Id*.

¶25.    Additionally, in *Franklin v. State*, 72 So. 3d 1129, 1138 (¶40) (Miss. Ct. App. 2011), this Court held that the trial court properly admitted a witness's prior inconsistent statement asserting that the defendant made a serious threat to the victim on the night the victim was shot.    In *Franklin*, the statement conflicted with the witness's trial testimony that the defendant's threat was made in jest.    *Id.*    The *Franklin* decision found that the prior inconsistent statement was properly admitted into evidence by the trial court as impeachment evidence, and not as substantive evidence of the defendant's guilt.    *Id*.    As a result, this Court ruled that the prior inconsistent statement was admissible in a prosecution for depraved-heart murder, even though the witness was called by the State to testify.    *Id*.[11]    Additionally, in *Moffett v. State*, 456 So. 2d 714, 720-21 (Miss. 1984), a witness's prior inconsistent statement was used to place Moffett at the crime scene at the time of the murder where the witness provided Moffett with an inconsistent alibi defense at trial.

¶26.    Like *Franklin*, in the instant case, the record reflects no finding by the trial court of bad faith or subterfuge.    Alternatively, evidence in the record supports the trial court's finding that Karen's prior statements constituted permissible impeachment evidence and were relevant and probative of the veracity of her trial testimony and also of the circumstances she alleged surrounded her inconsistent pretrial statements.    As discussed, Karen alleged and explained that she made her pretrial inconsistent statements due to threats and fear.    The Mississippi Supreme Court noted in *Carothers* that "[o]ur trial judges are

---

[11] *See* M.R.E. 613(b).

19

well-suited to make these calls" as to the admission or exclusion of prior inconsistent statements as impeachment evidence. *Carothers*, 152 So. 3d at 284 (¶21). The *Carothers* court clarified that "[t]o the extent that *Wilkins* holds otherwise, it is overruled." *Id.*

¶27. The evidence in the record supports the trial court's exercise of discretion and supports the trial court's finding that Karen's prior inconsistent statements were indeed relevant and probative of not only the truthfulness and veracity of her trial testimony but also relevant and probative to her alleged circumstances of fear and duress surrounding her pretrial statements. *See id.* Moreover, the record reflects no findings by the trial court that the impeachment evidence was admitted as a subterfuge or in bad faith. Since the record reflects sufficient evidence supporting the trial court's decision to admit Karen's pretrial inconsistent statements as impeachment evidence, the record therefore reflects no abuse of discretion in the trial court's decision to admit such statements into evidence at trial. A review of applicable jurisprudence reflects that a trial court possesses considerable discretion in the admission of impeachment evidence. Further, "[a]bsent an abuse of discretion, the trial court's decision on whether to admit evidence or exclude it will not be disturbed on appeal. Further, such error will warrant reversal only when the abuse of discretion has resulted in prejudice to the accused." *Gunn v. State*, 174 So. 3d 848, 858 (¶27) (Miss. Ct. App. 2014).

¶28. Pustay also asserts that the limiting instruction provided by the trial court failed to eliminate or mitigate any prejudice resulting from the impeachment evidence. The record reflects that the trial court then asked the defense counsel to prepare a defense instruction

providing that "the tape that's admitted as Exhibit 4 is not offered for substantive evidence but for the purposes of impeachment[.]" After trial, during the jury-instruction conference, the defense counsel informed the trial court that he did not currently have the limiting instruction, but hoped to soon. The State did have a limiting instruction prepared, and submitted it to the trial court, which the trial court gave to the jury as instruction C-15.

¶29. Instruction C-15 stated:

> The Court instructs the Jury that the taped statement entered into evidence of Karen Pustay may be used for the limited purpose of considering the truthfulness of Karen Pustay's in court testimony and not for the substance of her out of court statement.

The defense counsel objected to the instruction, asserting that the trial court needed to add another sentence stating: "[N]or could it be considered for the purposes of determining the innocence or guilt of" Pustay. However, the defense counsel admitted that he agreed with the first part of instruction C-15, that the State could impeach Karen with her recorded statements on the issue of the truthfulness of her testimony in court.

¶30. Since we have determined that the trial court properly found that Karen's recorded statements to police officers were admissible because they were relevant to her claim that her prior statements were made under duress or coerced, we find no reversible error in the trial court's decision declining to add Pustay's suggested language to the limiting instruction. This issue lacks merit.

## II. Whether the trial court erred in limiting Pustay's cross-examination of a State witness.

¶31. Pustay next argues the trial court improperly limited his cross-examination of Karen,

21

which prevented him from proffering alternative reasons for his controlling behavior toward Jane. The State counters that Pustay attempted to elicit irrelevant character evidence, which remained inadmissible on cross-examination.

¶32. We recognize that "[a] trial court has great latitude in [the] admission or exclusion of evidence where the question is one of materiality or relevancy, and its decision should only be reversed where this discretion is abused." *Watkins v. State*, 29 So. 3d 807, 810 (¶7) (Miss. Ct. App. 2009) (quoting *Blocker v. State*, 809 So. 2d 640, 645 (¶20) (Miss. 2002)).

¶33. Pustay claims that the trial court erred in limiting the following cross-examination of Karen:

> Q.   Now, you testified on direct examination that he would bring [Jane] to the police station because he distrusted her; is that correct?
>
> A.   Yes.
>
> Q.   Why is it he distrusted her?
>
> A.   Because [Jane]—
>
> [STATE]:        Object, Your Honor.
>
> THE COURT:      Sustained.
>
> [DEFENSE]:      May I—
>
> THE COURT:      Come up. Come up.
>
> (BENCH CONFERENCE NOT REPORTED).

After this exchange, Pustay's counsel started another line of questioning without further inquiry into this matter. The record reflects that Pustay provided no proffer for the record as to what evidence he sought to elicit or for what purpose.

22

¶34. Pustay argues the trial court improperly limited his right to cross-examination of Karen and cites to Mississippi Rule of Evidence 611(b), which provides that "[t]he court may not limit cross-examination to the subject matter of the direct examination and matters affecting the witness's credibility." Pustay, however, did not attempt to attack the credibility of Karen. Rather, Pustay's questioning appeared to question Jane's character. Evidence of a victim's character is ordinarily "irrelevant" and inadmissible. M.R.E. 404(a) & cmt. While Rule 611(b) "allows wide-open cross-examination so long as the matter probed is relevant," *Zoerner v. State*, 725 So. 2d 811, 813 (Miss. 1998), evidence of a victim's character is ordinarily "irrelevant" and inadmissible. *See Barber v. State*, 143 So. 3d 586, 593 (¶23) (Miss. Ct. App. 2013); M.R.E. 404(a) & cmt.

¶35. Additionally, as stated, the defense failed to make a proffer regarding Karen's testimony on this matter. Although a bench conference occurred, the record does not include those proceedings. "The supreme court has held that 'a trial court will not be reversed for limiting cross-examination where no proffer was made of the testimony nor was a statement dictated into the record to indicate what was proposed to be shown by the examination.'" *Watkins*, 29 So. 3d at 810 (¶7) (quoting *Blocker*, 809 So. 2d at 645 (¶20)). Therefore, the trial court did not abuse its discretion in sustaining the State's objection. This issue is without merit.

### III. Whether the trial court improperly limited Pustay's testimony.

¶36. Pustay next asserts the trial court improperly limited his defense by not allowing him to explain why he disciplined Jane after the State introduced evidence about his aggressive

23

behavior toward her. The record reflects that when Pustay testified on his own behalf, he attempted to explain that he disciplined Jane because she frequently lied. The State objected to this line of questioning, which the trial court sustained.

¶37. "The standard of review governing the admission or exclusion of evidence is abuse of discretion." *Williams v. State*, 991 So. 2d 593, 597 (¶8) (Miss. 2008) (citation omitted). "Thus, 'a trial judge enjoys a great deal of discretion as to the relevancy and admissibility of evidence. Unless the judge abuses this discretion so as to be prejudicial to the accused, the Court will not reverse this ruling.'" *Id*. (quoting *Shaw v. State*, 915 So. 2d 442, 445 (¶8) (Miss. 2005)).

¶38. Pustay claims the trial court improperly restricted his testimony when it sustained the State's objections after Pustay attempted to explain his reasons for disciplining Jane. The following questioning occurred on redirect examination:

> Q. Now, concerning [Jane] and some of the things she would do around the house, some of these typical—how was she when she came to be truthful to you and Karen?
>
> [STATE]: Objection, Your Honor.
>
> THE COURT: That's improper redirect, Mr. Rafferty [(defense counsel)].
>
> [DEFENSE]: Your Honor, they asked about the discipline, typical teenage stuff. Counsel got into that, Your Honor, and I should have a right to follow-up on it.
>
> THE COURT: I'll let you explore it to an extent.
>
> Q. Would you please explain to the jury.
>
> A. [Jane] lied to us a lot. Some big lies, some small lies.

24

THE COURT:     That's sustained, Mr. Rafferty. That's outside the purview of discipline.

Q.     Did you have to discipline her after these, these lies?

A.     Yes, I did.

[STATE]:     Objection, Your Honor.

THE COURT:     Sustained, Mr. Rafferty.

¶39. Pustay contends the State portrayed him as a physically abusive parent, which he could not defend against when the trial court prevented his testimony on the matter. Yet Pustay fails to show how testifying about Jane's alleged untruthful behavior served to rehabilitate his character.

¶40. In his appellate brief, Pustay cites *Terry v. State*, 718 So. 2d 1115, 1121 (¶28) (Miss. 1998), for the proposition that "[a] criminal defendant is entitled to present his defense to the finder of fact, and it is fundamentally unfair to deny the jury the opportunity to consider the defendant's defense where there is testimony to support the theory." *Id*. (citing *Keys v. State*, 635 So. 2d 845, 848-49 (Miss. 1994)). In *Terry*, Kay Terry argued the trial court erred in limiting her defense by excluding evidence that another person stole the money she was accused of embezzling. *Id*. at 1122 (¶30). This exclusion, Terry argued, prevented evidence of an alternative theory of the crime, which was critical to her defense. *Id*. at 1121-22 (¶¶26, 30). The supreme court reversed and remanded Terry's case because the trial court improperly excluded evidence of Terry's theory of the case. *Id*. at 1126 (¶51). However, in the present case, we find that Pustay failed to prove that his testimony about Jane's untruthful

25

behavior was relevant or was in the furtherance of his defense.

¶41. We further find that Pustay failed to show how these comments conformed with proper redirect. "The scope of redirect examination, while largely within the discretion of the trial court, is limited to matters brought out during cross-examination." *Lloyd v. State*, 755 So. 2d 12, 14 (¶9) (Miss. Ct. App. 1999) (citing *Blue v. State*, 674 So. 2d 1184, 1212 (Miss. 1996)). The transcript reflects that the State did not raise the issue of Jane's character for truthfulness during its cross-examination. Further, Pustay did not properly attempt to impeach Jane's character for truthfulness in accordance with the rules of evidence. *See* M.R.E. 608 (party can only attack witness's character for truthfulness or untruthfulness using opinion and reputation evidence). Therefore, we find that the trial court did not abuse its discretion in precluding Pustay's testimony of Jane's character.

### IV. Whether the trial court erred in denying Pustay's motion to review records of relevant youth-court proceedings.

¶42. Pustay contends the trial court erred when it denied his request for transcripts of certain youth-court proceedings regarding Jane. Pustay asserts that the trial court failed to sufficiently evaluate the transcript before denying his motion. Pustay further claims the trial court failed to compel the State to provide any youth-court records that the State possessed. The State argues that the trial court made a finding in the record that the youth-court records were merely cumulative, and the trial court prohibited either party from using evidence from the youth-court proceedings at trial.

¶43. Mississippi Code Annotated section 43-21-261 (Rev. 2015) limits the disclosure of youth-court proceedings. Section 43-21-261(c) contemplates the disclosure of certain

records to specific entities such as other courts and court personnel. This section does not, however, explicitly allow the unrestricted disclosure of youth-court records to parties not enumerated in the statute, such as a defendant in a separate criminal proceeding, like Pustay, seeking to use youth-court records to discredit a witness. Though the statute remains silent on this particular scenario, the supreme court has held that a criminal defendant may gain access to youth-court records in limited circumstances. *In re J.E.*, 726 So. 2d 547, 553 (¶23) (Miss. 1998).

¶44.    In *In re J.E.*, the supreme court addressed the issue of a defendant who sought disclosure of the youth-court records of a minor, who accused him of sexual battery, in order to prepare his defense. *Id*. at 549 (¶6). The supreme court adopted the standard provided in *Pennsylvania v. Ritchie*, 480 U.S. 39, 58 (1987), which allowed a trial court to review youth-court records in camera to determine if the defendant was entitled to any evidence from those proceedings. *In re J.E.*, 726 So. 2d at 553 (¶23). If the trial court found information relevant to the defense, the trial court would then disclose that information. *Id*. This limited review, however, precluded full access to all of the youth-court proceedings by the defendant; thus, the defendant's constitutional right to confrontation and the victim's statutory right to privacy remained intact. *Id*.

¶45.    Under the framework adopted by the supreme court, we find that the record supports a showing that the trial court herein indeed reviewed the youth-court transcript. In ruling on Pustay's motion, the trial court stated that the transcript of the youth-court proceedings "should remain confidential given the cumulative nature of the testimony to other discovery

27

received by [Pustay]." Therefore, the trial court satisfied the requirements set forth in *In re J.E.* and did not abuse its discretion.

¶46. Pustay also asserts the State possessed the youth-court transcript but failed to disclose the transcript in discovery. The State, however, contends it neither possessed the transcript nor used the transcript at trial. Pustay cites a motion for expenses for obtaining the youth-court transcript by the State from March 6, 2007, and an order granting payment of expenses from March 19, 2007, as evidence the State had the transcript.

¶47. Regardless, Pustay fails to articulate any reason that entitled him to a copy of the transcript. The trial court reviewed the transcript and failed to find any necessary disclosures. Further, the trial court found the State did not withhold any evidence during discovery, and the State declined to introduce any portion of the transcript at trial. Therefore, Pustay did not suffer any prejudice by not receiving the transcript. This issue is without merit.

### V. Whether Pustay's indictment was insufficient and vague, rendering it defective.

¶48. Pustay argues the dates of the alleged conduct in his indictment lacked specificity, and the trial court should have dismissed the indictment for vagueness. The State contends Pustay waived his objection to the indictment by not raising the issue at trial, and, the procedural bar notwithstanding, Pustay's claim lacks merit.

¶49. In examining the procedural bar proffered by the State, we recognize that an appellate court may not address an issue on appeal not raised at trial. *Davis v. State*, 660 So. 2d 1228, 1246 (Miss. 1995) ("[E]rror not raised at trial or in post-trial motions may not be reviewed on appeal."). However, the State inaccurately argues that Pustay failed to assert this issue

at trial. The record reflects that on December 7, 2006, Pustay indeed filed a motion to dismiss the indictment as "vague, lacking in specificity concerning the dates and facts of the case, and . . . not comply[ing] with the Uniform Rules of Circuit and County Court Practice[]." The trial court dismissed this motion as part of an order dismissing several of Pustay's pretrial motions on April 24, 2007. We thus find that Pustay sufficiently raised the issue below.

¶50. Turning to address the merits of Pustay's claim, we acknowledge that the question of "[w]hether an indictment is defective is a question of law, and we review such questions of law under a de novo standard." *Payton v. State*, 41 So. 3d 713, 717 (¶11) (Miss. Ct. App. 2009). "[T]he purpose of the indictment is to provide the accused reasonable notice of the charges against him so that he may prepare an adequate defense." *Warren v. State*, 187 So. 3d 616, 621 (¶10) (Miss. 2016). Similarly, Uniform Circuit and County Court Rule 7.06 mandates that an indictment "fully notify the defendant of the nature and cause of the accusation." Further, an indictment must contain "[t]he date and, if applicable, the time at which the offense was alleged to have been committed." URCCC 7.06(5).

¶51. Pustay's indictment reads in relevant part as follows:

COUNT I

. . . .

[O]n or between August, 1998, to May, 1999,

being at the time in question over the age of eighteen (18) years, for the purpose of gratifying his lust or indulging his depraved licentious sexual desires, [Pustay] did unlawfully, wilfully and feloniously handle, touch or rub with his hands, the vagina of [Jane], a child who was at the time in question under the age of sixteen (16) years[.]

. . . .

COUNT II

. . . .

[O]n or between August, 2004, to April, 2005,

being at the time in question over the age of eighteen years, for the purpose of gratifying his lust or indulging his depraved licentious sexual desires, [Pustay] did unlawfully, wilfully and feloniously handle, touch or rub with his hands, the vagina of [Jane], a child who was at the time in question not the spouse of the said Thomas Stephan Pustay and under the age of eighteen (18) years, while Thomas Stephan Pustay occupied a position of trust or authority, to-wit: parent[.]

. . . .

COUNT III[12]

. . . .

[O]n or between August, 2001, and May, 2002,

being at the time in question thirty-six (36) or more months older than [Jane], [Pustay] did wilfully, purposely, unlawfully and feloniously commit Sexual Battery upon [Jane], a child who was at the time in question at least fourteen (14) but under sixteen (16) years of age, by engaging in the act of sexual penetration, to-wit: by inserting his penis into the vagina of the said [Jane.]

. . . .

---

[12] Though Pustay raised a general objection to the specificity of the dates in his indictment, he did not specifically address the time period in Count III. In Count III, the indictment charged Pustay with sexual battery of a minor between the ages of fourteen and sixteen between August 2001 and May 2002. Yet during the majority of the time period alleged in Count III, Jane was thirteen years old. However, "[a] trial judge cannot be put in error on a matter which was not presented to him for decision." *Reynolds v. State*, 913 So. 2d 290, 299-300 (¶37) (Miss. 2005). Further, the plain-error doctrine does not apply. *See Flora v. State*, 925 So. 2d 797, 811 (¶42) (Miss. 2006) ("The plain error rule will only be applied when a defendant's substantive or fundamental rights are affected."). Therefore, this issue is without merit.

30

## COUNT IV

. . . .

[O]n or between August, 2002, and May, 2003,

being at the time in question thirty-six (36) or more months older than [Jane], [Pustay] did wilfully, purposely, unlawfully and feloniously commit Sexual Battery upon [Jane], a child who was at the time in question at least fourteen (14) but older sixteen (16) years of age, by engaging in the act of sexual penetration, to-wit: by inserting his penis into the vagina of the said [Jane.]

. . . .

## COUNT V

. . . .

[O]n or between August, 2003[,] and May 17, 2004,

being at the time in question thirty-six (36) or more months older than [Jane], [Pustay] did wilfully, purposely, unlawfully and feloniously commit Sexual Battery upon [Jane], a child who was at the time in question at least fourteen (14) but under sixteen (16) years of age, by engaging in the act of sexual penetration, to-wit: by inserting his penis into the vagina of the said [Jane.]

. . . .

## COUNT VI

. . . .

[O]n or between August, 2004, to April, 2005,

[Pustay] did wilfully, purposely, unlawfully and feloniously commit Sexual Battery upon [Jane], a child who was at the time in question under eighteen (18) years of age, by engaging in the act of sexual penetration, to-wit: by inserting his penis into the vagina of the said [Jane], while . . . Pustay occupied a position of trust or authority, to-wit: parent[.]

Each count in the indictment spans a time of approximately nine to ten months corresponding

31

to each school year that Jane alleged the misconduct occurred. Jane reiterated at trial several times in her testimony that she could not remember dates well, but could narrow down each of Pustay's acts to specific school years.

¶52. Pustay asserts the time frame for each count failed to fully notify him of the charges or allow him to prepare an adequate defense due to the time-specific nature of each charge. The supreme court has held "that a specific date in a child sexual abuse case is not required so long as the defendant is 'fully and fairly advised of the charge against him.'" *Brown v. State*, 983 So. 2d 1059, 1063 (¶14) (Miss. Ct. App. 2008) (quoting *Eakes v. State*, 665 So. 2d 852, 860 (Miss. 1995)).

¶53. Pustay relies on *Moses v. State*, 795 So. 2d 569, 570 (¶¶2, 8) (Miss. Ct. App. 2001), to support his position. In *Moses*, the indictment charged Willie Walter Moses with twenty-two crimes against two separate victims over a thirty-nine-month time period. *Id*. This Court reversed Moses's conviction and found that the indictment on multiple charges in the same indictment, for the same time span, and with identical language, precluded Moses from preparing an adequate defense. *Id*. at 572 (¶¶16-17). This Court added that the State possessed adequate knowledge to narrow the dates in the indictment but did not, which prejudiced Moses. *Id*. at (¶16).

¶54. In *Brown*, however, Thomas Lee Brown asserted his indictment lacked date specificity when the indictment charged him with the fondling of a child between January 1, 2004, and January 31, 2004. *Brown*, 983 So. 2d at 1062 (¶11). Like Pustay, Brown relied on *Moses*. This Court in *Brown* found that, unlike in *Moses*, the State could not narrow down the dates

in the indictment. *Id*. at 1063 (¶13). Accordingly, this Court found the indictment was sufficient and affirmed Brown's conviction. *Id*. at 1063-64 (¶15).

¶55. As in *Brown*, the record before us fails to indicate the State possessed any knowledge to narrow down the time period for the charges against Pustay. Further, each count in the indictment contained separate date ranges and different language. Though two counts overlap in dates, the counts were separate crimes.

¶56. After our review of the indictment and relevant caselaw, we find the language of the indictment sufficient to put Pustay on notice of the charges against him. We further find that Pustay suffered no prejudice in preparing an adequate defense. This issue lacks merit.

**VI.** **Whether trial court erred in its *Batson* analysis and in placing jurors stricken by Pustay back onto the jury.**

¶57. Pustay next argues that the trial court erred in placing two venire persons struck by defense counsel back on the jury. Pustay maintains that his counsel's explanations for striking these jurors were gender neutral and related to venire responses, employment, and demeanor.

¶58. "This Court affords great deference to a trial-court ruling on a *Batson*[13] challenge." *Hughes v. State*, 90 So. 3d 613, 626 (¶38) (Miss. 2012). In *Walker v. State*, 815 So. 2d 1209, 1215 (¶12) (Miss. 2002), the supreme court stated that "determination of discriminatory intent will likely turn on a trial judge's evaluation of a presenter's credibility and whether an explanation should be believed." The *Walker* court explained that "[o]ne of the reasons the trial court is afforded such deference when a *Batson* challenge is raised is because the

---

[13] *Batson v. Kentucky*, 476 U.S. 79 (1986).

demeanor of the attorney making the challenge is often the best evidence on the issue of [gender] neutrality." *Id*. Accordingly, we recognize that "[o]n appellate review, the trial court's decision is accorded great deference and will be reversed only when such decision is clearly erroneous" or against the overwhelming weight of the evidence. *Id*.; *Hughes*, 90 So. 3d at 626 (¶38).

¶59.    In *Batson v. Kentucky*, 476 U.S. 79 (1986), the United States Supreme Court "established that the Equal Protection Clause of the United States Constitution prohibits racial discrimination through the use of peremptory challenges." *Hughes*, 90 So. 3d at 625 (¶35). The United States Supreme Court extended this rule to state that a party likewise may not base a peremptory challenge on gender. *Id*.; *see J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127, 129 (1994). These cases provided a three-step inquiry that the trial court must follow to determine whether there is a discriminatory reason for a peremptory challenge. *Hughes*, 90 So. 3d at 625 (¶35) (citing *Pitchford v. State*, 45 So. 3d 216, 224 (Miss. 2010)).

> First, the party objecting to the peremptory strike of a potential juror must make a prima facie showing that [gender] was the criterion for the strike. Second, upon such a showing, the burden shifts to the [other party] to articulate a [gender]-neutral reason for excluding that particular juror. Finally, after a [gender]-neutral explanation has been offered the trial court must determine whether the objecting party has met its burden to prove that there has been purposeful discrimination in the exercise of the peremptory strike, i.e., that the reason given was a pretext for discrimination.

*Id*. at 625-26 (¶35).

¶60.    The *Hughes* court provided that "[a] prima facie case can be shown by demonstrating that the percentage of peremptory strikes exercised on members of the protected class was significantly higher than the percentage of members of the protected class in the venire." *Id*.

34

at 626. After a prima facie case has been made, the party must present gender-neutral reasons for the peremptory strikes. *Chamberlin v. State*, 989 So. 2d 320, 337 (¶57) (Miss. 2008). The supreme court has explained that in order to be deemed gender neutral, "[t]he reasons need not be persuasive, or even plausible; so long as the reasons are not inherently discriminatory[.]" *Id*.

¶61. Regarding the third step, the supreme court provided that the party opposing the strikes "may attempt to refute the other party's race/gender-neutral reason by showing that the reason was a pretext for discrimination." *Hughes*, 90 So. 3d at 626 (¶37). In *Hughes*, the supreme court identified five "indicia of pretext" that may contradict a gender-neutral reason for a strike:

> (1) disparate treatment, that is, the presence of unchallenged jurors of the opposite race who share the characteristic given as the basis for the challenge; (2) the failure to voir dire as to the characteristic cited; (3) the characteristic cited is unrelated to the facts of the case; (4) lack of record support for the stated reason; and (5) group-based traits.

*Id*. However, the supreme court cautioned: "Where multiple reasons lead to a peremptory strike, the fact that other jurors may have some of the individual characteristics of the challenged juror does not demonstrate that the reasons assigned are pretextual." *Id*. (quoting *Lynch v. State*, 877 So. 2d 1254, 1274 (Miss. 2004)).

¶62. The record reflects that of its first eight peremptory strikes, the defense struck six women during the jury-selection process, and only accepted two females. The State objected pursuant to *Batson*, asserting that the defense was striking women from the jury. The trial court responded that it would not require a gender-neutral reason from the defense for

striking the venire persons at that time. After defense counsel used its ninth peremptory strike on a female, the State again objected. The trial court asked the defense to provide the court with a gender-neutral reason for striking this prospective juror. The defense replied that this juror worked for the school district and that "people with us thought [during voir dire] she gave a [nonverbal] reaction that she couldn't be fair." When pressed to specify what kind of the reaction this prospective juror exhibited, and what her responses were, defense counsel simply stated, "We just saw the things we saw," and argued that there were more women than men on the jury panels collectively. The defense finally stated that the gender-neutral reason for striking the prospective juror was that she worked for a school district and that the defense made some observations about her reactions during voir dire. The trial court then overruled the State's objection and allowed the peremptory strike to stand.

¶63. The defense then used its next strike on yet another woman, which the State followed with an objection. The trial court requested the defense to provide a gender-neutral reason for the strike. The defense responded that the prospective juror was a sixty-two-year old homemaker and that they had questioned her on the issue of "whether . . . she could believe a child versus not." When questioned regarding the prospective juror's response, the defense admitted that she did not provide a response. The defense then explained that "there's better jurors down the panel." The trial court ruled that the defense's reason was insufficient and seated the prospective juror on the jury.

¶64. The defense then used its tenth peremptory strike on the next juror, a female. When

36

the trial court asked for a gender-neutral reason for the peremptory strike, the defense responded, "Better jurors, your Honor." The trial court then asked the defense counsel:

> [Do] you think that . . . after the court's already determined that there's a pattern of using peremptory challenges based on gender, . . . [you] can strike another female to get to a better juror with no more reason than that, with nothing objectionable about [the prospective juror]? I just want the appellate court to know, you know, the basis of your challenge.

The defense responded that the prospective juror did not stand out and did not answer a lot of questions. The defense also explained that "we don't believe we are striking women for the sole sake of striking women" and argued that "we just feel there's better jurors coming up for the defense perspective based on the fact that this is an accountant, she's 50 years old. Based on that, Your Honor, we're using a peremptory challenge." The trial court granted the State's objection and seated the prospective juror on the jury. Pustay's jury was ultimately composed of four women and eight men, with two male alternates.

¶65. The defense objected to the trial court granting the State's motion to overrule the defense's peremptory challenges and moved to "quash the whole venire," asking for a mistrial. The trial court overruled the defense's motion.

¶66. As stated, on appellate review, the trial court is accorded great deference when ruling on a *Batson* challenge. *Hughes*, 90 So. 3d at 626 (¶38). This Court will reverse a trial court's ruling only when it is clearly erroneous or against the overwhelming weight of the evidence. *Id.*; *Hughes*, 90 So. 3d at 626 (¶38). The record reflects that the trial court herein observed a pattern by the defense of using peremptory strikes based on gender and required the defense to provide gender-neutral reasons for its strikes. The trial court found the

37

defense's explanations insufficient, and as a result, seated the two females on the jury. After our review of the transcript, we find that the trial court did not err in denying two of Pustay's peremptory strikes against females.

> **VII.  Whether the trial court erred in admitting irrelevant and prejudicial evidence of Pustay's character in violation of Rule 404(b).**

¶67.    Pustay argues that the trial court erred in allowing Jane and Magan to testify about Pustay's aggressive behavior toward Jane. Pustay asserts that their testimony constituted irrelevant and prejudicial character evidence that violated Mississippi Rule of Evidence 404(b). Pustay also argues the trial court failed to appropriately consider the evidence under Rule 403.

¶68.    We review the admission or exclusion of evidence under an abuse-of-discretion standard. *Hargett v. State*, 62 So. 3d 950, 952 (¶7) (Miss. 2011) (citation omitted). Furthermore, "[a] trial judge enjoys a great deal of discretion as to the relevancy and admissibility of evidence. Unless the judge abuses this discretion so as to be prejudicial to the accused, the Court will not reverse this ruling." *Id*. at 952-53 (¶7) (quoting *Price v. State*, 898 So. 2d 641, 653 (¶29) (Miss. 2005)).

¶69.    Rule 404(b) provides:

> Evidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character. . . . This evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident.

"As there exists an inherent danger of prejudicial effect in the use of other[-]acts evidence,

the 404(b) exception for which the crime is introduced must be a material issue in the case. Moreover, its probative value must not be substantially outweighed by the prejudicial effect." *Leedom v. State*, 796 So. 2d 1010, 1015 (¶15) (Miss. 2001); M.R.E. 403.

¶70.    The prejudicial evidence Pustay complains of first arose when Pustay cross-examined Jane regarding any physical abuse. The transcript reflects that on cross-examination, defense counsel asked:

> Q.    Did anyone else ever see any bruises?
>
> A.    You mean—
>
> Q.    Other than you.
>
> A.    People would see them. I mean, they were never really major like on my legs or on my arms, nothing like that. The abuse would only be if he would choke me and push me against the wall or slap me or hit me. It was never beating me with [sic] anything like that.
>
> Q.    And your teachers never saw these bruises on you?
>
> A.    They saw a couple of bruises sometimes, but they never would expect my father to do it. And when they asked me, I would just tell me [sic] I hurt myself playing outside or something.
>
> Q.    So the teacher's questioned you, but you weren't honest with them about how it happened? . . .
>
> A.    No, I didn't tell them what was really going on.

¶71.    The defense counsel clearly elicited the testimony concerning Pustay's alleged physical abuse of Jane. Therefore, Pustay introduced this evidence, not the State. Further, the line of questioning appears to attack Jane's credibility by demonstrating previous instances where she lied to school officials rather than disparaging Pustay's character. The

trial court told defense counsel: "I'm not sure I've ever been faced with someone trying to attack the victim's credibility by putting in evidence of an assault by the defendant, but if that's what you want to do, . . . I'm going to allow it."

¶72. The transcript does not reflect any Rule 403 test performed by the trial court to determine whether the probative value of the testimony that Pustay physically abused Jane was not substantially outweighed by the prejudicial effect of the testimony. *See Leedom*, 796 So. 2d at 1015 (¶15). However, "[i]t is well-settled that a defendant who 'opens the door' to a particular issue runs the risk that collateral, irrelevant, or otherwise damaging evidence may come in on cross-examination." *Martin v. State*, 970 So. 2d 723, 725-26 (¶11) (Miss. 2007) (citation omitted). "A defendant cannot complain on appeal concerning evidence that he himself brought out at trial." *Id.* (citing *Fleming v. State*, 604 So. 2d 280, 289 (Miss. 1992)). Thus, Pustay cannot now claim the trial court erroneously admitted the evidence.

¶73. Magan also testified about her observations of Pustay's physical aggression with Jane. Magan testified: "He would, you know, push her against the car and choke her if they were arguing, or just basically manhandle her . . . . It was aggression." Pustay failed to object to this portion of Magan's testimony. "The general rule is that a failure to object with specificity in the trial court . . . results in a waiver of review by this Court." *Stevens v. State*, 458 So. 2d 726, 730 (Miss. 1984). Regardless of any waiver, Pustay's failure to object precluded the trial court from considering the admissibility of the evidence.

¶74. Pustay only objected when the State cross-examined him. The State questioned Pustay regarding an online blog comment he posted about a fight between Jane and Magan.

40

The State asked:

> Q. Have you ever gotten involved with spats between her and her girlfriends?
>
> A. Not directly involved between the two of them. I did put a comment on my web blog, excuse me, about the spat. . . .
>
> Q. And is that when you put on there, you'll find out what kind of an asshole I can be?
>
> [DEFENSE]: Objection, Your Honor. That's totally improper and irrelevant to the issues at hand and what came out during direct examination, Your Honor, and during this whole trial.
>
> THE COURT: Overruled. Again, cross-examination is not limited to direct examination, Mr. Rafferty.
>
> [DEFENSE]: But, Your Honor, there's no foundation for him to even ask that question.
>
> THE COURT: Overruled.
>
> [THE STATE]: I'll move on, Your Honor.
>
> THE COURT: Overruled. If he didn't put it on there, he can say he didn't.

On redirect, Pustay did not deny the blog post.

¶75. Pustay failed to assert that the blog-post entry constituted improper character evidence under Rule 404(b). Further, Pustay opened the door to the line of questioning about his aggressive behavior toward Jane. Therefore, we cannot say the trial court erred in admitting evidence of Pustay's aggressive character. This issue is without merit.

**VIII. Whether the trial court erred in excluding relevant and probative evidence under Rule 412.**

¶76.    Next, Pustay argues the trial court erred in excluding evidence of Jane's past sexual behavior and prior false allegations of sexual assault under Mississippi Rules of Evidence 412(b)(2)(A) and (b)(2)(C).

¶77.    As stated, "[t]his Court reviews the rulings of the trial court admitting or excluding evidence for abuse of discretion." *Aguilar v. State*, 955 So. 2d 386, 392 (¶19) (Miss. Ct. App. 2006) (citing *Ladnier v. State*, 878 So. 2d 926, 933 (¶27) (Miss. 2004)). "An error in the admission or exclusion of evidence is not grounds for reversal unless the error affected a substantial right of a party." *Id.*; M.R.E. 103(a).

¶78.    Mississippi Rule of Evidence 412(a) states, in part: "The following is not admissible in a criminal case involving an alleged sexual offense: (1) reputation or opinion evidence of a victim's past sexual behavior; and (2) evidence of a victim's past sexual behavior other than reputation or opinion, except under subdivisions (b) and (c)." "[Rule 412] is designed to prevent the introduction of irrelevant evidence of the victim's past sexual behavior to confuse and inflame the jury into trying the victim rather than the defendant." *Blackmon v. State*, 803 So. 2d 1253, 1258 (¶25) (Miss. Ct. App. 2002) (citing *Hughes v. State*, 735 So. 2d 238, 273 (¶153) (Miss. 1999)).

¶79.    Rule 412(b) provides certain exceptions to the prohibition in Rule 412(a). Rule 412(b)(2)(A) allows the trial court to admit "evidence of: (1) specific instances of a victim's past sexual behavior: (A) with a person other than the defendant, if offered by the defendant to prove that someone else was the source of semen, pregnancy, disease, or injury[.]" Additionally, Rule 412(b)(2)(C) permits evidence of "false allegations of sexual offenses

42

made at any time before trial by the victim."

¶80.    When a defendant offers proof of a victim's past sexual behavior that purports to meet one of the exceptions in Rule 412(2), the trial court may admit the evidence "only if the court: conducts a hearing in chambers to determine admissibility of the evidence . . . [and] finds that the probative value of relevant evidence outweighs the danger of unfair prejudice." *See* M.R.E. 412(c)(2)(A) & (D); M.R.E. 403.

¶81.    The record shows that at a pretrial hearing on Pustay's motion seeking to present evidence of Jane's past sexual behavior under Rule 412(b)(2)(A) and Rule 412(b)(2)(C), Pustay attempted to show another person whom Jane had a sexual relationship with was the source of semen found on a towel that Jane claimed Pustay used after sex. However, in defense of its motion, Pustay only proffered Jane's testimony and an inconclusive DNA test as evidence of semen on the towel. The trial court deemed this evidence insufficient to rebut that any semen on the towel was from Pustay.

¶82.    In this instance, "[t]he critical question is whether the evidence tends to demonstrate that another person is the actual source of the injury, or whether the evidence is simply offered to show the promiscuity or character of the victim." *Blackmon*, 803 So. 2d at 1258 (¶26). The trial court herein determined Jane's testimony about the semen on the towel went to her credibility rather than to prove the source of the semen under Rule 412. Therefore, the trial court properly excluded the evidence as it tended to reflect more on Jane's character than the source of the semen.

¶83.    The trial court, however, allowed Pustay to proceed with a Rule 412 hearing on the

43

issue of prior false allegations of sexual assault under Rule 412(b)(2)(C). During the hearing, Pustay elicited testimony from Jane regarding two prior allegations of sexual assault against two separate individuals, as well as a prior allegation against Pustay. First, Jane accused a man named Damon Dixon of attempted sexual assault. Jane testified she initially admitted the assault happened, then recanted her story to Pustay, but maintained the assault happened in her statements to the authorities. The trial court directly asked Jane whether the assault occurred, and Jane testified that it did.

¶84. The trial court also considered whether Jane made a previous false allegation of sexual assault against another police officer who worked with Pustay. Jane testified she never accused the officer of any sexual assault. Other evidence at the hearing showed that Jane allegedly told Pustay of the incident, and Pustay reported the allegation to his superiors. The police chief investigated the incident and determined no abuse occurred. Lastly, Jane testified she never previously lied to a school counselor about any alleged sexual abuse by Pustay.

¶85. In its order denying Pustay's motion seeking to introduce evidence pursuant to Rule 412(b)(2)(b), the trial court recognized that under Rule 412(c)(2)(D),

> the [trial court] must determine that the "evidence which the accused seeks to offer is relevant and that the probative value of such evidence outweighs the danger of unfair prejudice." Such evidence, that of false allegations for past sexual offenses, must exist for such a determination to be made . . . . As to the first, there was no proof that the complaining witness made an allegation of any kind against Officer Michael Lally. Secondly, there is no probative evidence that the allegation of attempted sexual assault by Damon Dickson was false. And finally, no evidence was introduced that the complaining witness, while an [eighth] grade student, made an allegation of sexual misconduct against this defendant to a school counselor, removing this

44

"allegation of an allegation" from the purview of Rule 412.

¶86.    The trial court determined the evidence presented at the hearing was insufficient to prove any false allegation occurred.  Therefore, the trial court correctly found the evidence inadmissible under Rule 412(c)(3).  This issue is without merit.

### IX.    Whether the trial court erred in admitting improper lay-opinion testimony.

¶87.    Pustay next argues that the trial court erred in allowing the State to offer the lay opinion of Jane's friend, Magan.  Megan testified that whenever Jane said that she had to do chores around the house, it meant that Pustay required Jane to perform sexual acts with him.  Pustay asserts that since Magan's opinion "was total conjecture, it was incompetent, prejudicial and inadmissible."  The State counters that Magan did not offer her opinion, but merely recounted her factual observations of Jane, which fall outside the scope of lay-opinion testimony.

¶88.    Mississippi Rule of Evidence 701 states:

> If a witness is not testifying as an expert, testimony in the form of an opinion is limited to one that is:
>
> > (a)    rationally based on the witness's perception;
> >
> > (b)    helpful to clearly understanding the witness's testimony or to determining a fact in issue; and
> >
> > (c)    not based on scientific, technical, or other specialized knowledge within the scope of Rule 702.

¶89.    In the present case, the record reflects that Jane testified that Pustay made her have sex with him before she could go out to places, including to Magan's house.  Jane provided

the following testimony on the defense's cross-examination:

Q. Isn't it true that you told at least one investigator that your friends understood that when you said you had chores to do, this meant you had to have sex with your father?

A. Yes, ma'am.

Q. And so your friends did know that this was going on?

A. One friend. It was only one friend that I hinted it to. Nobody else ever suspected anything. It was just one friend.

Q. Was it a hint, or did she know this was going on?

A. She knew. She told me later on that she knew, but I never came right out and told her.

Q. And this friend was Magan?

A. Yes, ma'am.

¶90. Later in the trial, during the State's questioning of Magan on the subject, the following occurred:

Q. If I mentioned something about doing chores, does that sound familiar to you?

A. Yes, sir.

Q. Can you tell the jury, please, what that means as it relates to this situation?

[DEFENSE]: Your Honor, I've got to offer an objection. This young lady now will be nothing but giving her opinion as to what's going on or what someone else told her, and Your Honor, that is not a fact. This is something she learned from somebody else, and that's improper direct examination. . . .

THE COURT: Just a minute. Stop with the speaking objections. It's

overruled. It's her own observations and conclusions she's drawn on her own, which are subject to cross-examinations, Mr. Rafferty. Overruled. . . .

[THE STATE]: The times where [Jane] was allowed to come over and spend the night, would she ever say something about having to do chores?

[MAGAN]: Yes, sir. Yes, sir.

Q. Just tell us what you understood that to mean.

A. I understood it to mean having to do sexual things with her father. This was on my own. It would be at school, and it would be, you know, such a task for her to come stay the night at my house. And, you know, I'd wait [thirty], [forty-five] minutes, you know after I've gotten off the phone with her once we were home.

¶91. We recognize that in order to determine whether a witness's testimony is properly admitted as lay-opinion testimony, the following two-part test must be met: "First, the testimony must assist the trier of fact. Second, the opinion must be based on the witness['s] firsthand knowledge or observation." *Jones v. State*, 678 So. 2d 707, 710 (Miss. 1996); M.R.E. 701 cmt. "The second prong of the test is in accordance with [Rule] 602 requiring that a witness who testifies about a certain matter have personal knowledge of that matter." *Id*.; *see also Walls v. State*, 928 So. 2d 922, 926 (¶10) (Miss. Ct. App. 2006).

¶92. Magan testified she came to the conclusion about chores on her own. Pustay argues that this makes Magan's testimony regarding chores pure "conjecture." However, as stated, the transcript reflects that Jane indicated in her testimony that she "hinted" to Magan that when she said she had chores to do, that meant having sex with Pustay. Jane further stated that Magan later told Jane she knew chores meant sex with Pustay. Therefore, we find that

Magan possessed the requisite firsthand knowledge or observations to show she knew Jane's definition of chores meant sex with Pustay.

¶93.    "A lay witness may testify regarding an opinion that is based upon [her] personal perceptions, and that will help the jury fairly resolve a controverted, material fact." *Reynolds v. State*, 136 So. 3d 452, 459 (¶23) (Miss. Ct. App. 2014) (citation omitted).  Though Magan provided no testimony that she observed Jane conduct any "chores," whether of a sexual nature or not, Magan formulated an opinion based on Jane's hints, as well as other indications in Jane's behavior.  The record shows that Magan testified to clarify to the jury about the signals and behaviors she observed from Jane and about aspects of Jane's behavior that she perceived.  Therefore, we find that the trial court did not err in allowing Magan's testimony.   This issue lacks merit.

## X.    Whether Pustay received constitutionally ineffective assistance of counsel, which resulted in prejudice.

¶94.    Pustay claims that he was denied effective assistance of counsel, which prejudiced his defense.

¶95.    We recognize that in order "[t]o prove ineffective assistance of counsel, [the defendant] must show that:  (1) his counsel's performance was deficient, and (2) this deficiency prejudiced his defense." *Collins v. State*, 70 So. 3d 1144, 1147 (¶16) (Miss. Ct. App. 2011); *Strickland v. Washington*, 466 U.S. 668, 687 (1984). The burden of proof rests with Pustay to show both prongs. *Jackson v. State*, 73 So. 3d 1176, 1181 (¶19) (Miss. Ct. App. 2011).  A strong presumption exists "that a counsel's performance falls within the range of reasonable professional assistance." *Id*.   "To overcome this presumption, the defendant

48

must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id*.

¶96. In addition, a strong presumption exists that an attorney's conduct is the result of trial strategy, which generally includes an attorney's decision of whether or not to file certain motions, call witnesses, ask certain questions, or make certain objections. *Foreman v. State*, 830 So. 2d 1278, 1280-81 (¶11) (Miss. Ct. App. 2002). We note that a court must judge the reasonableness of counsel's challenged conduct on the facts of the particular case viewed at the time of counsel's conduct. *Strickland*, 466 U.S. at 689-90.

¶97. We also acknowledge that "[i]t is unusual for this Court to consider a claim of ineffective assistance of counsel when the claim is made on direct appeal because there is usually insufficient evidence within the record to evaluate the claim." *Shinn v. State*, 174 So. 3d 961, 965 (¶11) (Miss. Ct. App. 2015) (citing *McClendon v. State*, 152 So. 3d 1189, 1191-92 (¶12) (Miss. Ct. App. 2014)). "When a claim of ineffective assistance of counsel is raised on direct appeal, it should be addressed only when (1) the record affirmatively show[s] ineffectiveness of constitutional dimensions, or (2) the parties stipulate that the record is adequate to allow the appellate court to make the finding without consideration of the findings of fact of the trial judge." *Collins,* 70 So. 3d at 1147-48 (¶17) (citing *Colenburg v. State*, 735 So.2d 1099, 1101 (¶5) (Miss. Ct. App. 1999)). Accordingly, "[i]f this Court does not reverse on other grounds and is unable to conclude that the defendant received ineffective assistance of counsel, it should affirm without prejudice to the defendant's right to raise the ineffective assistance of counsel issue via appropriate post-conviction proceedings" *Id*. at

49

1148 (¶17). We thus recognize that "[r]eview on direct appeal of an ineffective-assistance-of-counsel claim is confined strictly to the record." *Id*. Our review of the record reflects no affirmative showing of ineffectiveness of constitutional dimensions. However, although the State does not stipulate that the record is complete for purposes of determining the competency of the defense counsel, Pustay stipulates that the record is complete.

¶98. Pustay complains that his counsel improperly introduced, or opened the door to, irrelevant and prejudicial other-alleged-bad-act evidence, which would have been inadmissible under Rule 404(b). Pustay claims that this involved his trial counsel asking Jane about reporting alleged physical (nonsexual) abuse of Jane by Pustay when she was in the fifth grade. Pustay maintains that this questioning allowed Jane to describe that "[t]he abuse would only be if he would choke me and push me against the wall or slap me or hit me." Pustay argues that the testimony elicited by his counsel had no role in this case and was inflammatory and prejudicial.

¶99. Pustay next asserts that his trial counsel also failed to object to Magan's testimony that on occasion Pustay was "very aggressive" with Jane. Magan testified that Pustay would, "push [Jane] up against the car and choke her if they were arguing, or just basically manhandle her instead of punishing her like she should be punished."

¶100. Pustay claims that his trial counsel was "inept" at attempting to have exhibit D-2ID, the report from Reliagene Technologies Inc. regarding the towel submissions, admitted into evidence without a Mississippi Rule of Evidence 901 sponsoring witness. Pustay argues that this evidence was clearly exculpatory and admissible since the towels had been seized by

investigators and tested, and also testified about at trial. However, Pustay asserts that his trial counsel failed to obtain a proper Rule 901 sponsor for this crucial evidence.

¶101. Finally, Pustay claims that his trial counsel failed to have William Gasparrini, Ph.D., properly served with a trial subpoena. Pustay states that Dr. Gasparrini is a clinical psychologist who evaluated Jane.

¶102. We have previously discussed the issue of Jane and Magan's testimony regarding Pustay's physical abuse of Jane and found that the trial court did not err in allowing the testimony. As stated, a strong presumption exists that an attorney's conduct is the result of trial strategy, which generally includes an attorney's decision of whether or not to file certain motions, call witnesses, ask certain questions, or make certain objections. *Foreman*, 830 So. 2d at 1281 (¶11). We further find that the record shows that even without Jane and Magan's testimony on the issue of Pustay's aggression, the State produced enough testimony and evidence for the jury to have found Pustay guilty of two counts of the crime of touching a child for a lustful purpose and three counts of the crime of sexual battery. "The jury determines the weight and credibility to give witness testimony and other evidence." *Moore v. State*, 933 So. 2d 910, 922 (¶43) (Miss. 2006). Jane testified in detail about multiple acts of sexual abuse by Pustay.

¶103. The transcript also shows that the defense counsel attempted to have a document admitted into evidence containing the analysis from the forensic tests performed on a towel that Jane claimed contained Pustay's semen and pubic hairs. The defense counsel attempted to have this evidence admitted through the testimony of Investigator Prendergast of the

51

Harrison County Sheriff's Department. The State objected, arguing that Investigator Prendergast was not the proper witness to introduce the results from the forensic tests. The trial court sustained the State's objection after learning that Investigator Prendergast neither prepared the report nor discussed the report with its author. Later in the trial, the defense counsel again attempted to have the forensic results admitted into evidence, but he admitted that he did not have anyone from ReliaGene Technology, the company that performed the testing, to testify as to the results in order to properly offer the results into evidence. The document containing the forensic test results appears in the record before us and reveals that tests for semen performed on the towels resulted in a "negative" finding for semen. Although the trial court did not allow these findings into evidence, the trial court did allow the defense counsel to argue during closing that the State did not possess any forensic evidence showing that Pustay had sexual relations with Jane.

¶104. Again, we find that even without presenting the results of the forensic testing to the jury, the record shows that the State produced enough testimony and evidence for the jury to have found Pustay guilty of two counts of the crime of touching a child for a lustful purpose and three counts of the crime of sexual battery.[14] "The jury determines the weight and credibility to give witness testimony and other evidence." *Moore*, 933 So. 2d at 922 (¶43). Additionally, the defense counsel was allowed to argue, and did so at closing, that the

---

[14] "In deciding whether the State presented legally sufficient evidence to support a jury's verdict, this Court must determine whether, when viewing the evidence in the light most favorable to the State, any rational juror could have found that the State had proved each element of the crime charged beyond a reasonable doubt." *Galloway v. State*, 122 So. 3d 614, 665 (¶168) (Miss. 2013).

State failed to provide "one bit . . . of physical proof" of any sexual contact between Pustay and Jane.

¶105. Regarding Pustay's claim that his defense counsel failed to have Dr. Gasparrini subpoenaed, the transcript reveals that defense counsel informed the trial court that it attempted to subpoena Dr. Gasparrini on May 9, 2007.[15] The defense counsel explained that the subpoena was served upon Dr. Gasparrini's receptionist. Dr. Gasparrini told the defense counsel that he was not available to be in court on May 11, 2007, but that he could in fact appear on May 14, 2007. The defense counsel stated that when he informed Dr. Gasparrini that his attendance was not discretionary, Dr. Gasparrini responded that the defense had improperly served the subpoena upon his receptionist, rather than serving him directly. The defense counsel admitted that Dr. Gasparrini was not personally served with the subpoena, but counsel argued that typically when dealing with professionals, a subpoena to one of their receptionists has constituted adequate service.

¶106. As stated, Pustay bears the burden of proving how Dr. Gasparrini's testimony would

---

[15] Additionally, the record shows that the defense filed a pretrial motion for the disclosure of medical records for Jane's psychiatric and psychological history. The defense counsel specifically asked for a complete copy of Dr. Gasparrini's file on Jane. The State informed the trial court that it had provided the defense counsel with "everything that Dr. Gasparrini produced." When the trial court asked if Dr. Gasparrini received any of Jane's prior psychiatric or psychological testing, the State responded, "I don't know, Your Honor. But I would be very doubtful having dealt with these kind of cases in the past. Certainly he would have included that in his opinion." The State confirmed that Dr. Gasparrini did address in his report that he reviewed Jane's history. After requesting that the State provide the trial court with an entire copy of Dr. Gasparrini's file to review in order to "determine if there's anything in it that should be disclosed to counsel for review," the trial court overruled Pustay's motion for the disclosure of Dr. Gasparrini's records.

have changed the outcome of the trial.[16] Dr. Gasparrini did not testify at trial, and Pustay failed to allege in his appellate brief what information Dr. Gasparrini might have presented through his testimony. Also, the record reflects that Pustay did not request a continuance based on this matter.

¶107. Since the record before us does not provide sufficient information to permit us to consider the merits of Pustay's claim for ineffective assistance of counsel, this Court would thus have to consider matters outside of the record in order to fully explore Pustay's claim. *See Sharkey v. State*, 856 So. 2d 545, 547 (¶9) (Miss. Ct. App. 2003). As a result, we find that the "appropriate resolution" of Pustay's claim is deny relief without prejudice, so that Pustay can raise his ineffective-assistance-of-counsel issue through appropriate postconviction proceedings, if he so chooses. *Id*.

### XI. Whether Count II, lustful touching, merged with Count VI, sexual battery.

¶108. Pustay asserts that the gratification-of-lust count in his indictment should have merged with the sexual-battery count since the State presented insufficient evidence to show that gratification of lust occurred between August 2004 and April 2005. The indictment herein charged Pustay with lustful touching between August 2004 and April 2005 as Count II, while Count VI charged Pustay with sexual battery for the same time period. Pustay cites to *Friley*

---

[16] Upon our review of the record, we find that during the pretrial motion hearing on the defense's motion to offer evidence of Jane's past sexual behavior pursuant to Mississippi Rule of Evidence 412, the parties discussed the issue of Dr. Gasparrini's testimony. The transcript of this hearing shows that Dr. Gasparrini opined that Jane's behavior was consistent with being sexually abused. We cannot say that the admission of such testimony would have changed the outcome of the trial.

*v. State*, 879 So. 2d 1031, 1035 (¶18) (Miss. 2004), and claims that when penetration is achieved by touching a child, gratification of lust is a lesser-included offense of sexual battery. Pustay contends this resulted in two convictions for the same crime, in violation of his constitutional protection against double jeopardy.

¶109. While the record does indeed reflect that Pustay objected to the indictment as defective in that it was too vague, ambiguous, and lacked specificity concerning the dates and the facts of the particular case, we cannot find that Pustay objected to the specific issue of whether Count II should have merged with Count VI. When a defendant fails to object to the form of the indictment, the issue is waived on appeal. *Franklin v. State*, 766 So. 2d 16, 18 (¶7) (Miss. Ct. App. 2000); *see also Jenkins v. State*, 101 So. 3d 161, 168 (¶22) (Miss. Ct. App. 2012). "Failure to make a contemporaneous objection constitutes waiver of the objection and cannot be raised for the first time on appeal because the trial court is denied the opportunity to consider the issue and possibly remedy the situation." *Copeland v. Copeland*, 904 So. 2d 1066, 1073 (¶24) (Miss. 2004) (citing *De La Beckwith v. State*, 707 So. 2d 547, 574 (Miss. 1997)); *see also Kirk v. State*, 160 So. 3d 685, 693 (¶20) (Miss. 2015). Procedural bar notwithstanding, we turn to address the merits of this issue.

¶110. Mississippi Code Annotated section 97-3-95(2) (Rev. 2014) states: "[a] person is guilty of sexual battery if he or she engages in sexual penetration with a child under the age of eighteen (18) years if the person is in a position of trust or authority over the child including without limitation the child's . . . parent[.]"

¶111. In contrast, section 97-5-23(2) states, in part:

Any person above the age of eighteen (18) years, who, for the purpose of gratifying his or her lust, or indulging his or her depraved licentious sexual desires, shall handle, touch or rub with hands or any part of his or her body or any member thereof, any child younger than himself or herself and under the age of eighteen (18) years who is not such person's spouse, with or without the child's consent, when the person occupies a position of trust or authority over the child shall be guilty of a felony . . . .

Miss. Code Ann. § 97-5-23(2) (Rev. 2014). Count II of Pustay's indictment charged that Pustay "for the purpose of gratifying his lust or indulging his depraved licentious sexual desires, did unlawfully, wilfully and feloniously handle, touch or rub with his hands, the vagina of [Jane], a child[.]"

¶112. Our supreme court has held that "[a] jury may convict an accused of a lesser-included offense on trial of any indictment." *Friley*, 879 So. 2d at 1034 (¶13) (citations omitted). The *Friley* court provided:

> The test for determining whether one offense is a lesser-included offense of another is:
>
>> Whether applied for the benefit of the state or defense, in order to authorize such instruction the more serious offense must include all the elements of the lesser offense, that is, it is impossible to commit the greater offense without at the same time committing the lesser-included offense. Also, there must be some evidence to support the lesser-included offense.

*Id.*

¶113. In *Friley*, the supreme court found that molestation served as a lesser-included offense of sexual battery under the circumstances of that case. *Id*. at 1035 (¶17). The supreme court explained: "We draw a reasonable inference from the circumstances that Friley's actions were done with the purpose of gratifying his lust." *Id*.

¶114. However, "[u]nder Mississippi law, sexual battery of a child and unlawful touching are separate and distinct criminal offenses. While sexual battery of a child requires some sort of penetration—including fellatio—unlawful touching does not." *Faulkner v. State*, 109 So. 3d 142, 147 (¶20) (Miss. Ct. App. 2013).

¶115. In *Faulkner*, this Court recognized that the *Friley* court's holding "is not absolute" and did not extend to all cases. *Id*. at 148 (¶20). "As our supreme court recently recognized in *Tapper*, 'it is possible to commit an unlawful touching without committing sexual battery.'" *Id*. at (¶21) (quoting *Tapper v. State*, 47 So. 3d 95, 103 (¶30) (Miss. 2010)); *see also Jenkins*, 101 So. 3d at 168-69 (¶22). Further, "where sufficient evidence exists to support separate and distinct acts of fondling and sexual battery, separate indictable charges can properly stand without implicating jeopardy issues. This is so even if the criminal acts are closely connected or based on a common nucleus of fact[.]" *Id*.

¶116. In *Faulkner*, the defendant asserted that his convictions for sexual battery and unlawful touching during overlapping time periods constituted double-jeopardy violations. *Faulkner*, 109 So. 3d at 147 (¶19). However, the victims in *Faulkner* also testified to different and distinct occurrences of touching and battery over an extended time period of seven years. *Id*. at (¶22). This Court found that a jury could reasonably infer that the different crimes could have occurred in separate instances within the time period of the charges. *Id*. at (¶24).

¶117. Like *Faulkner*, in the case before us, Jane, the victim, testified to various incidences of touching and sex over the course of several years. As a result, the evidence showed that

separate occurrences of gratification of lust and sexual battery by Pustay likely occurred during the same time period but have occurred during separate instances. Because the jury could have reasonably inferred these two separate crimes happened during the same time period, we find that Count II did not merge with Count VI. This issue lacks merit.

### XII. Whether the evidence was sufficient or whether the verdicts were supported by the weight of the evidence.

¶118. Pustay argues that the evidence presented at trial was insufficient to convict him of gratification of lust and sexual battery. Pustay further claims that his guilty verdict was not supported by the weight of the evidence.

¶119. The supreme court has articulated that when evaluating the sufficiency of the evidence, this Court must decide whether it allows a jury to find "beyond a reasonable doubt that [the] accused committed the act charged, and that he did so under such circumstances that every element of the offense existed; and where the evidence fails to meet this test it is insufficient to support a conviction." *Bush v. State*, 895 So. 2d 836, 843 (¶16) (Miss. 2005). "[T]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id*.

¶120. Also, "in determining whether a jury verdict is against the overwhelming weight of the evidence[,] this Court must accept as true the evidence which supports the verdict and will reverse only when convinced that the [trial] court has abused its discretion in failing to grant a new trial." *Sanders v. State*, 32 So. 3d 1214, 1217 (¶10) (Miss. Ct. App. 2014). "Only in those cases where the verdict is so contrary to the overwhelming weight of the

58

evidence that to allow it to stand would sanction an unconscionable injustice will this Court disturb it on appeal." *Id*. "Thus, the scope of review on this issue is limited in that all evidence must be construed in the light most favorable to the verdict." *Pryer v. State*, 958 So. 2d 818, 823 (¶11) (Miss. Ct. App. 2007).

¶121. In support of his assertion, Pustay maintains that Jane's testimony was not corroborated by any of the occupants of the family home. Pustay also maintains that Jane's testimony was impeached. Pustay further claims that Jane's behavior after the alleged assaults failed to "lend credence to her accusations" since she did not immediately report the abuse, nor did she show any indiction of trauma.

¶122. The transcript reflects that the jury heard detailed testimony from Jane regarding Pustay's sexual assault and why she did not immediately report the assault to law enforcement. Jane testified that Pustay began touching her in a sexual nature when she was in the fifth grade, and the touching escalated to sexual intercourse by the time Jane entered the sixth grade.

¶123. Jane also testified that she did not report Pustay's actions "[b]ecause I guess I was scared because, I mean, I loved my dad, and I didn't want to get him in trouble. And really, I didn't know what was wrong at the time because I was so young." Jane stated that Pustay told her not to tell anyone about his conduct. The jury also heard Jane testify that she never really trusted anybody. Jane testified that her father, Pustay, "was the main person I trusted, and he had betrayed my trust." Jane further testified that after Karen observed Pustay lying on top of her, "[Karen] wouldn't talk to me. She pretty much hated me, and we had no

relationship whatsoever."

¶124. Viewing the evidence presented in the light most favorable to the State, we find that the testimony presented at trial was sufficient for a rational juror to have found beyond a reasonable doubt that the essential elements of the crimes of gratification of lust and sexual battery were committed by Pustay. *See Pryer*, 958 So. 2d at 823 (¶11).

¶125. Additionally, we have held that "the unsupported word of the victim of a sex crime is sufficient to support a guilty verdict where the testimony is not discredited or contradicted by other credible evidence, especially if the conduct of the victim is consistent with the conduct of one who has been victimized by a sex crime." *Davis v. State*, 878 So. 2d 1020, 1027 (¶29) (Miss. Ct. App. 2004) (citing *Cross v. State*, 759 So. 2d 354, 356 (¶11) (Miss. 1999)). Additionally, we recognize that "[t]he weight and credibility to be given to a witness's testimony 'are within the sole province of the jury as fact finder.'" *Butler v. State*, 102 So. 3d 260, 268 (¶27) (Miss. 2012) (quoting *King v. State*, 798 So. 2d 1258, 1262 (¶14) (Miss. 2001)). "[The] Court has repeatedly held that 'the jury is the final arbiter of a witness's credibility.'" *Howell v. State*, 860 So. 2d 704, 731 (¶92) (Miss. 2003) (quoting *Williams v. State*, 794 So. 2d 1019, 1028 (¶59) (Miss. 2001)).

¶126. After finding the evidence presented against Pustay sufficient to establish the elements of gratification of lust and sexual battery beyond a reasonable doubt, we find that the verdict of the jury was not contrary to the overwhelming weight of the evidence. We thus affirm Pustay's conviction.

**XIII. Whether cumulative error requires reversal.**

60

¶127. Finally, Pustay simply asks that if this Court finds that any trial errors standing alone are insufficient to warrant a new trial, that this Court consider whether the cumulative prejudicial effect of these errors would warrant a new trial.

¶128. We recognize that "[e]rrors that do not require reversal themselves may require reversal if, when taken cumulatively, they deny the defendant the right to a fundamentally fair and impartial trial." *Graham v. State*, 967 So. 2d 670, 677-78 (¶34) (Miss. Ct. App. 2007) (citing *Byrom v. State*, 863 So. 2d 836, 847 (¶12) (Miss. 2003)); *see also Galloway*, 122 So. 3d at 682 (¶247). "In any case in which a court finds harmless error or an error not sufficient in itself to warrant dismissal, the court may, on a case-by-case basis, determine whether the errors taken cumulatively warrant dismissal based on their cumulative prejudicial effect." *Graham*, 967 So. 2d at 678 (¶34). However, the supreme court has explained that "where no error has occurred, there can be no cumulative error." *Corrothers v. State*, 148 So. 3d 278, 325 (¶134) (Miss. 2014).

¶129. "Because we have found that no error occurred at [Pustay's] trial, there can be no cumulative error." *Id.* This issue lacks merit.

¶130. **THE JUDGMENT OF THE HARRISON COUNTY CIRCUIT COURT, FIRST JUDICIAL DISTRICT, OF CONVICTION OF COUNTS I AND II, GRATIFICATION OF LUST, AND SENTENCE OF FIFTEEN YEARS ON EACH COUNT; COUNTS III AND V, SEXUAL BATTERY OF A CHILD AT LEAST FOURTEEN BUT UNDER SIXTEEN YEARS OF AGE, AND SENTENCE OF TWENTY-FIVE YEARS ON EACH COUNT; AND COUNT VI, SEXUAL BATTERY OF A CHILD UNDER EIGHTEEN YEARS OF AGE, AND SENTENCE OF TWENTY-FIVE YEARS, WITH THE SENTENCE IN COUNT III TO RUN CONSECUTIVELY TO THE SENTENCE IN COUNT II, AND WITH THE SENTENCES IN ALL OTHER COUNTS TO RUN CONCURRENTLY WITH ONE ANOTHER, ALL IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED**

**TO HARRISON COUNTY.**

LEE, C.J., ISHEE, JAMES AND GREENLEE, JJ., CONCUR. BARNES, FAIR AND WILSON, JJ., CONCUR IN PART AND IN THE RESULT WITHOUT SEPARATE WRITTEN OPINION. GRIFFIS, P.J., SPECIALLY CONCURS WITH SEPARATE WRITTEN OPINION, JOINED BY IRVING, P.J. AND FAIR, J.; ISHEE AND JAMES, JJ., JOIN IN PART.

**GRIFFIS, P.J., SPECIALLY CONCURRING:**

¶131. I take issue with the majority's legal analysis in Issue I. The majority's decision effectively changes the Mississippi Rules of Evidence. The taped statement is clearly and unequivocally hearsay, and no hearsay exception will allow the statement to be admitted. The impeachment rules do not trump the hearsay rules. As a result, I respectfully disagree with the majority's analysis of this issue, but I join the result.

> *Whether the trial court erred in allowing the State to treat its own witness as hostile and establish its case through impeached testimony.*

¶132. In this issue, Pustay claims that it was error for the trial court *to admit Karen's recorded statement* as part of the State's impeachment of her testimony. The majority determines "that Karen's recorded statements to police officers were admissible because they were relevant to her claim that her prior statements were made under duress or coerced." I do not follow the majority's analysis. There is a difference in allowing the prior statement to be used for impeachment and allowing it to be admitted into evidence.

¶133. The State called Karen to testify during the its case-in-chief and expected her to testify that Pustay admitted that he had molested and sexually battered Jane. She did not testify consistent with this expectation. The State then proceeded to impeach her testimony. First, the State impeached her when she admitted that she had previously given a statement that

was inconsistent with her testimony at trial. Second, the State impeached her when it used the transcript of her interrogation and asked her to admit that she had previously testified inconsistent with her trial testimony. Third, the State was allowed to impeach Karen's trial testimony when the trial court allowed the redacted audio recordings of the interrogations into evidence. I am of the opinion that the trial court was incorrect in allowing the audio recordings to be admitted into evidence.

¶134. Under Mississippi Rule of Evidence 613(a), a witness may be impeached by reading a prior inconsistent statement to the witness and asking the witness whether the statement accurately reflects what was said on the prior occasion. *Johnson v. State*, 905 So. 2d 1209, 1212 (¶20) (Miss. 2005). However, a party may never use his witness's prior statement in the "guise of impeachment for the primary purpose of placing before the jury substantive evidence[,] which is not otherwise admissible," in order to avoid the hearsay rule. *Flowers v. State*, 773 So. 2d 309, 326 (¶58) (Miss. 2000).

¶135. Karen clearly testified that she had given two different versions of whether Pustay had admitted to molesting Jane. Her admission was proper impeachment under Mississippi Rules of Evidence 607 and 613. The trial judge was even concerned about her admission of perjury. The judge stopped the examination and told Karen that she could be prosecuted for perjury and advised her of her constitutional rights to counsel and to remain silent.

¶136. Despite this admonition, Karen's testimony continued:

> Q.    Ma'am, isn't it true that he admitted to you he was having sex with your daughter?
>
> A.    No.

63

Q. Ma'am, I'm referring to—

A. I know the statement.

THE COURT: Just a minute. Ms. Pustay, let him finish his question, please.

[WITNESS]: I don't want to read any more from the statement.

THE COURT: You don't have that option, ma'am.

[WITNESS]: It's not true.

THE COURT: Answer his questions, please.

Q. What did you say when the officer said, "Did he admit to the first time?" It's right here, ma'am. You can read that to the jury.

A. I know I said that, but it's not true.

Q. Ladies and gentlemen—or, ma'am, tell the jury what you told the police officers.

A. (Reading) Yeah. I think he said he did molest her. He rubbed on her, is what he told me. I said it's not true.

Q. That's not what you said at that time, ma'am. Read your transcript to the jury.

. . . .

A. (Reading) Yeah. I think he did say he did molest her. Rubbed on her, is what he told me.

Q. Ma'am, isn't it true you said, "He said he did molest her. He rubbed on her, is what he told me?"

. . . .

A. I just told you I lied. That statement is mostly all a lie. I was upset. I was scared. I wanted out of there. Just made me believe if I supported her, they'd let me go home.

64

¶137. Then, the State used Officer Pullen to sponsor the audio recording of Karen's first interrogation. Pustay's counsel objected on the grounds of foundation, hearsay, and relevance in addition to his continuing objections to the State's improper impeachment. The trial court responded, "What hearsay? This is a taped statement between you, Officer Pullen and Ms. Pustay." The State did not offer, and the trial court judge did not ask for, an exception to the hearsay rule that would permit an out-of-court statement by a non-party witness to be admitted. Also, the trial court did not find that it was not offered to prove the truth of the matter asserted.

¶138. The majority does not address this issue. Indeed, the trial court's decision that the taped statement was not hearsay was incorrect. Mississippi Rule of Evidence 801(c) provides that "'[h]earsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Karen's taped statements were clearly within this definition. Therefore, the trial court needed to find that the taped statement was either non-hearsay under the definition of Rule 801(d) or an exception to the hearsay rule under Rules 803 or 804 before the statement could be played for the jury. The trial court judge listened to the tape, then stated:

> This tape, the portion that I just heard with the redaction that I've ordered, is what I'm going to allow on the issue of impeach[ment], not only impeaching Ms. Pustay's statement, but also as to the issue as to whether the statement was coerced or forced or whether she gave it under duress. It's admissible and probative and relevant for that purpose.

¶139. The State then offered the audio recording of the second interrogation. The trial court judge also admitted it into evidence with similar redactions.

¶140. Both of these audio recordings were hearsay. The impeachment rules do not allow for the admission into evidence of a hearsay statement, for the purpose of impeachment or otherwise, without the statements falling within the definition of non-hearsay under Rule 801(d) or an appropriate exception under Rules 803 or 804. The trial court was in error to admit the taped statements without a hearsay exception.

¶141. However, I do not find this error to be reversible error. The trial court judge did give a limiting instruction to the jury:

> The Court instructs the jury that the taped statement entered into evidence of Karen Pustay may be used for the limited purpose of considering the truthfulness of Karen Pustay's in-court testimony and not for the substance of her out-of-court statement.

The trial judge asked Pustay's attorney to draft a limiting instruction. Therefore, it was Pustay's obligation to proffer a limiting instruction if he wanted one. Pustay's attorney did not have a limiting instruction ready at the jury instruction conference, so the State submitted one. The limiting instruction used was not the best instruction that could have been prepared, but Pustay's attorney did not object to it. Therefore, the language suggested by Pustay in this appeal could have been worded better, but I am not of the opinion that the trial judge committed reversible error since Pustay had the opportunity to offer a different instruction.

¶142. For these reasons, I join the majority opinion but write separately to address my different opinion as to the legal analysis on the admission of the taped statements in Issue I.

**IRVING, P.J., AND FAIR, J., JOIN THIS OPINION; ISHEE AND JAMES, JJ., JOIN THIS OPINION IN PART.**