# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2023-KA-00006-COA

**JASON TAMAYO GALANG, JR. A/K/A JASON GALANG A/K/A JAYSON T. GALANG, JR.**  APPELLANT

**v.**

**STATE OF MISSISSIPPI**  APPELLEE

DATE OF JUDGMENT:                    11/17/2022
TRIAL JUDGE:                         HON. DEWEY KEY ARTHUR
COURT FROM WHICH APPEALED:           RANKIN COUNTY CIRCUIT COURT
ATTORNEY FOR APPELLANT:              CHRISTOPHER A. COLLINS
ATTORNEY FOR APPELLEE:               OFFICE OF THE ATTORNEY GENERAL
                                     BY: LAUREN GABRIELLE CANTRELL
DISTRICT ATTORNEY:                   JOHN K. BRAMLETT JR.
NATURE OF THE CASE:                  CRIMINAL - FELONY
DISPOSITION:                         AFFIRMED - 08/20/2024
MOTION FOR REHEARING FILED:

**BEFORE CARLTON, P.J., WESTBROOKS AND SMITH, JJ.**

**SMITH, J., FOR THE COURT:**

¶1.    A Rankin County Circuit Court jury convicted Jayson T. Galang Jr. of one count of sexual battery and acquitted him of another count of sexual battery. The Rankin County Circuit Court sentenced Galang to serve thirty years in the custody of the Mississippi Department of Corrections (MDOC), with ten years suspended and five years of post-release supervision. The circuit court ordered Galang to pay all court costs and a $2,000 fine to the Victims of Human Trafficking Fund. In addition, the circuit court ordered Galang to register as a sex offender upon his release and to have no contact with the victim, D.L.[1] On appeal,

_____

    [1] To protect the victim's privacy, we use initials for both the victim and her sister.

Galang argues the circuit court erred by excluding video evidence of his prior sexual history with D.L. and excluding testimony from D.L.'s sister. Finding no reversible error, we affirm Galang's conviction and sentence.

**FACTS**

¶2. Galang and D.L. began dating in 2016 and had a son together. Although the couple's relationship ended in 2020, D.L. and Galang continued to live together until D.L. secured her own apartment in January 2021.

¶3. On July 28, 2021, D.L. agreed to have dinner with Galang to gain closure about their relationship and to discuss their son starting daycare. During dinner, D.L. told Galang that she felt their relationship was over. Following dinner, Galang drove D.L. back to her apartment. Even though D.L. told Galang it was not a good idea for him to come inside her apartment, Galang followed D.L. to her door. After Galang insisted on entering, D.L. allowed him to come into the apartment. Once inside, Galang sexually assaulted D.L. despite her crying and repeatedly begging him to stop.

¶4. After Galang left the apartment, D.L. told a friend about the sexual assault. In response to the friend's advice, D.L. went to the hospital that same night and reported the assault. A sexual-assault nurse examined D.L., and the results of the sexual-assault kit she administered to D.L. showed that D.L.'s vaginal swab tested positive for seminal fluid and sperm cells.

¶5. Investigator Tyler Burnell with the Flowood Police Department arrived at the hospital

2

after receiving the report about the sexual assault. Investigator Burnell spoke with D.L. about the incident, and D.L. identified Galang as the person who had assaulted her. After Galang had been taken into custody and waived his *Miranda*[2] rights, Investigator Burnell conducted a recorded interview with Galang about the events that occurred on July 28, 2021. During the interview, Galang admitted that D.L. had informed him over dinner that she no longer wanted to be romantically involved with him. When he drove D.L. back to her apartment, he followed her to the door even though she had not invited him inside the apartment. Galang further admitted that he acted aggressively once inside the apartment and tried to kiss D.L. despite her objections. Galang also confirmed that even after D.L. got away from him and locked herself inside her bedroom, he remained at the apartment and tried to get her to come out of her bedroom.

¶6. Galang admitted that when D.L. eventually opened the bedroom door a little bit, he pushed his way inside and removed her pants. Galang stated that he refused to listen even though D.L. told him to stop. Galang told Investigator Burnell that he vaginally penetrated D.L. with his penis. When Investigator Burnell asked if Galang vaginally penetrated D.L. with his finger first, Galang responded that he probably had done so. Galang admitted that he had forced D.L. to have sex with him, and he stated that he believed he had ejaculated on D.L. rather than inside her. Based on Galang's admissions and the totality of the evidence, law enforcement arrested him and charged him with sexual battery.

---

[2] *Miranda v. Arizona*, 384 U.S. 436 (1966).

¶7.     On August 2, 2021, Investigator Burnell again spoke with Galang. Galang arrived at the Flowood Police Department to collect his cell phone, which the police had seized after his arrest. Galang had previously consented to a search of his cell phone, and during the search, law enforcement discovered nine sexually explicit videos of D.L. and Galang. Law enforcement extracted the videos and preserved copies as evidence. Investigator Burnell was concerned, however, that Galang might use the videos to embarrass D.L. after his arrest. To prevent any retaliatory action, Investigator Burnell asked Galang to sign a consent form acknowledging that Galang voluntarily agreed to delete the videos from his phone. Galang signed the consent form, and while in Investigator Burnell's presence, he deleted the videos from his phone.

¶8.     A Rankin County grand jury indicted Galang for two counts of sexual battery against D.L. Prior to trial, Galang moved to introduce eight of the cell phone videos as evidence of D.L.'s past sexual behavior with him. Galang had recorded the videos on various dates in April 2021. He asserted the videos were admissible as an exception to Mississippi Rule of Evidence 412(a)'s prohibition against introducing evidence of a victim's past sexual behavior. Galang contended the videos "demonstrate[d] a pattern" of consensual "rough sex" between him and D.L. and supported his defense theory that D.L. had consented to the same type of consensual sex on the night in question. In addition to arguing that the videos were admissible and relevant to his defense, Galang contended that the videos' risk of unfair prejudice did not substantially outweigh their probative value.

¶9.     In response, the State argued that although the videos showed prior instances of consensual sex between Galang and D.L., they failed to establish that D.L. had consented on the night of July 28, 2021. The State asserted that the videos from April 2021 were "very different" from the events of July 28, 2021, that both D.L. and Galang had described. The State also asserted that Galang had admitted during his recorded interview with Investigator Burnell that D.L. had not consented to have sex with him on the night in question. The State therefore asked that the videos be excluded.

¶10.    At the first hearing on Galang's motion, the defense reduced the number of videos it sought to admit to two. The defense continued to assert its argument that the videos established D.L. previously had engaged in consensual rough sex with Galang. During the hearing, the circuit judge stated that he was "not inclined to necessarily exclude [all] evidence of prior consensual activity." As the circuit judge pointed out, the jury would become aware of Galang and D.L.'s prior consensual relationship because the two had a child together. However, the circuit judge questioned the defense as to "what in particular about these videos" made it more likely that D.L. had consented on July 28, 2021.

¶11.    After the parties presented their arguments on Galang's motion, the circuit judge explained that he would allow questions at trial about "whether or not [Galang and D.L.] have engaged in consensual sex in the past, whether or not she's allowed [Galang] to video that sex[,] and whether or not that was . . . rough sex." Continuing, the circuit judge stated he was not yet sure "that the video[s] of those acts are necessarily required to get the

5

evidence in front of the jury." The circuit judge informed the parties that he would reserve his ruling on the admissibility of the two videos until he had reviewed them.

¶12. By the date of the next hearing, the circuit judge had reviewed the two videos that Galang sought to admit into evidence. The circuit judge found that the videos portrayed "sexual activity between two consenting adults on a different day" than July 28, 2021, and that neither video "contain[ed] any information about [D.L.] refusing consent or . . . [Galang] forcing himself in through a door or anything forcible being done in these videos." The circuit judge concluded "that the prior videos [did] not make it more likely that [D.L.] consented" on July 28, 2021, and that any probative value did not outweigh the danger of unfair prejudice. As a result, the circuit judge excluded the videos.

¶13. At trial, D.L. testified that at dinner on July 28, 2021, she told Galang that she felt their relationship was over, and she asked Galang to drop the topic. The two then discussed their son and how they thought he would handle starting daycare. After dinner, Galang drove D.L. home. Galang asked to go inside D.L.'s apartment, but she told him she did not think that was a good idea. When D.L. reached her apartment door, she testified that Galang had followed her. Although she tried to shut the apartment door, Galang insisted on coming inside. D.L. allowed Galang inside and mentally prepared for an argument, which she testified had been a common occurrence over the course of their relationship.

¶14. D.L. stated that once inside the apartment, Galang pinned her against the hallway wall and tried to kiss her. D.L. told Galang to stop and to leave her apartment. D.L. testified that

she got away from Galang and made it down the hallway and into her bedroom, where she locked the door. D.L. stated that Galang attempted to get into her bedroom and begged her to come out. Finally growing angry, D.L. opened the door. D.L. testified that she planned to stand up to Galang and demand that he leave.

¶15. Instead, D.L. stated that Galang pushed her into the bedroom and forced her onto the bed. As she cried and screamed for him to stop, he took off her leggings and lay on top of her. Although D.L. begged Galang to stop, he kept telling her that she knew she "wanted it" and to stop fighting him. D.L. testified that Galang initially inserted his fingers into her vagina and then inserted his penis. D.L. stated that she tried to push Galang off her and that he threatened to ejaculate inside her if she did not stop. D.L. testified that she continued to cry and scream but that Galang did not stop assaulting her until he had finished. Afterward, Galang moved to the other side of D.L.'s bed. As D.L. continued crying and attempted to pull her leggings back on, Galang became angry and asked, "So what? Did I rape you or something?" D.L. testified that she did not respond but left the bedroom. After Galang got dressed, he apologized to D.L., who again told him to leave her apartment.

¶16. D.L. testified that later that same night, Galang texted her and again apologized for hurting her. Galang stated in his text messages that he just wanted D.L. and their family back. D.L. told Galang that she hated him for assaulting her after she begged him not to do it. In his response, Galang stated that he hated himself at that moment, too. He said, "And[,] no[,] I didn't enjoy it and was a fool to think you would." Galang also told D.L., "I am

7

deeply sorry. I hurt for you not only emotionally but physically this time. [I'm] ashamed of myself. I hate myself. [I'm] disgusting. I don't deserve[] you and the boys. I need to get away. [I'm] sorry." In his final text message to D.L., Galang wrote,

> I know you hate me[.] I wish we could talk. But I know that's impossible tonight. I know you hate seeing me now. . . . It's my fault. . . . I'm truly sorry for everything I've done to you. I didn't mean to hurt you. I want to stop hurting you. I'm sorry for loving you but not treating you the way you should be treated. . . .

¶17. Once Galang was gone, D.L. called a female friend. D.L. told her friend what happened, and the friend asked if D.L. was going to go to the hospital. D.L. testified that she waited about thirty minutes to ensure Galang was gone, and then she drove herself to the hospital. D.L. testified that she called a long-time male friend on her way to the hospital, and he remained on the phone with her until she arrived at the hospital. Before leaving her apartment, D.L. had written down on a piece of paper that she needed a sexual-assault kit performed on her. Upon checking in at the hospital, D.L. handed the paper to the woman at the front desk. A sexual-assault nurse administered a sexual-assault kit to D.L., and hospital personnel contacted law enforcement. The results of the sexual-assault kit showed that D.L.'s vaginal swab tested positive for seminal fluid and sperm cells.

¶18. D.L.'s sister S.L. testified as a witness for the defense. S.L. stated that she had never really gotten along with her sister. S.L. further stated that she currently did not have a close relationship with D.L. and had not recently spoken with D.L. S.L. testified that she had lived with D.L. in early 2021. S.L. recalled that during that time frame, D.L. had explored the

8

possibility of obtaining a court order to grant her full custody of the son she shared with Galang. S.L. stated that she also remembered D.L. meeting with an attorney during that same time frame. S.L. testified that when D.L. returned home from her meeting with the attorney, D.L. appeared angry and upset.

¶19. When S.L. began to testify as to what D.L. had said about her meeting with the attorney, the State objected to the testimony as hearsay. The defense argued that S.L.'s testimony fell under an exception to hearsay because the testimony showed D.L.'s state of mind at the time of the meeting. The defense sought to admit the testimony to demonstrate that D.L. had a motive to falsely accuse Galang of sexual assault. After considering the parties' arguments, the circuit judge sustained the State's objection to the testimony. In response to further questions from Galang's attorney, however, S.L. confirmed that as of the date of Galang's trial, D.L. had obtained full custody of her son.

¶20. After both parties rested, the jury deliberated and convicted Galang of one count of sexual battery and acquitted him of the other count. The circuit court sentenced Galang to serve thirty years in MDOC's custody, with ten years suspended and five years of post-release supervision. The circuit court ordered Galang to pay a $2,000 fine to the Victims of Human Trafficking Fund. The circuit court also ordered Galang to register as a sex offender upon his release from custody and to have no further contact with D.L. Galang moved unsuccessfully for judgment notwithstanding the verdict or, alternatively, a new trial. Aggrieved, Galang appeals.

**DISCUSSION**

¶21. Galang's two issues on appeal deal with the circuit court's decision to exclude certain evidence. "We review the decision to admit or exclude evidence under an abuse of discretion standard." *Goode v. State*, 374 So. 3d 592, 601 (¶19) (Miss. Ct. App. 2023) (quoting *Moberg v. State*, 303 So. 3d 815, 820 (¶17) (Miss. Ct. App. 2020)). "An error in the admission or exclusion of evidence is not grounds for reversal unless the error affected a substantial right of a party." *Pustay v. State*, 221 So. 3d 320, 347 (¶77) (Miss. Ct. App. 2016).

### I. Excluded Video Evidence

¶22. Galang first challenges the circuit court's exclusion of the video evidence he sought to introduce of D.L.'s prior sexual behavior with him. Galang asserts the video evidence "was imperative to [his] defense to establish that he and [D.L.] had an ongoing sexual history[,]" and he contends that the circuit court's exclusion of the evidence "denied [him] a fair trial."

¶23. Rule 412(a) prohibits the admission of "evidence of a victim's past sexual behavior" in criminal cases "involving an alleged sexual offense." Rule 412(b) provides certain limited exceptions to the prohibition, including one for "evidence of . . . specific instances of a victim's past sexual behavior . . . with the defendant, if offered by the defendant to prove consent . . . ." "When a defendant offers proof of a victim's past sexual behavior that purports to meet one of the exceptions in Rule 412[(b)], the trial court may admit the evidence 'only if the court: conducts a hearing in chambers to determine admissibility of the

evidence and finds that the probative value of relevant evidence outweighs the danger of unfair prejudice.'" *Pustay*, 221 So. 3d at 347 (¶80) (quoting MRE 412(c)(2)(A) & (D)); *see also* MRE 403 ("The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."). "Rule 412 is designed to prevent the introduction of irrelevant evidence of the victim's past sexual behavior to confuse and inflame the jury into trying the victim rather than the defendant." *Pustay*, 221 So. 3d at 347 (¶78) (quoting *Blackmon v. State*, 803 So. 2d 1253, 1258 (¶25) (Miss. Ct. App. 2002)).

¶24. Here, the circuit judge determined during the pretrial hearings that the two videos Galang sought to admit depicted sexual activity that was of a different nature than the July 28, 2021 events that both D.L. and Galang described to law enforcement. Specifically, the circuit judge found that the videos portrayed consensual activity. Moreover, the circuit judge found that nothing in the videos showed "[D.L.] refusing consent or . . . [Galang] forcing himself in through a door or anything forcible being done in these videos." The circuit judge concluded that the videos failed to satisfy the relevancy requirement of Mississippi Rule of Evidence 401(a), which provides that "[e]vidence is relevant if . . . it has any tendency to make a fact more or less probable than it would be without the evidence . . . ." The circuit judge concluded that the videos failed to cast doubt on D.L.'s statement that she did not consent to sex with Galang on July 28, 2021. According to the circuit judge, the videos'

11

content did "not make it more likely that [D.L.] consented" to sex with Galang on that date. In addition, the circuit judge found that any potential probative value of the videos did not outweigh the danger of unfair prejudice.

¶25. Upon review of the circuit judge's thorough analysis and ultimate determination that the two videos were inadmissible under Rule 412 to show consent, we agree. We therefore find no abuse of discretion in the circuit judge's decision to exclude the videos from evidence.

## II. S.L.'s Excluded Testimony

¶26. At trial, the defense sought to introduce testimony through S.L. about a conversation she and D.L. had after D.L. met with an attorney to discuss obtaining a court order to grant D.L. full custody of the son she shared with Galang. The circuit judge sustained the State's objection to the testimony. On appeal, Galang asserts that the circuit judge erred by not conducting an on-the-record analysis of the testimony's probative value compared to its risk of unfair prejudice. Galang also asserts that S.L.'s testimony was admissible under Rule 803(3) to show that D.L. had a motive to falsely accuse him of sexual assault.

¶27. The record reflects, however, that after the circuit judge sustained the State's objection to S.L.'s testimony, the defense failed to make a proffer of the expected testimony. "When a trial court prevents the introduction of certain evidence, it is incumbent on the offering party to make a proffer of the potential testimony of the witness, or the point is waived for appellate review." *Williams v. State*, 281 So. 3d 263, 270 (¶18) (Miss. Ct. App. 2019). The

12

procedural bar notwithstanding, we conclude that, at most, any alleged error arising from the exclusion of S.L.'s testimony about D.L.'s motives amounted to harmless error.

¶28.    As the parties recognize on appeal, Rule 803(3) provides an exception to the hearsay prohibition for statements "of the declarant's then-existing state of mind (such as motive, intent, or plan) . . . ." Thus, while testimony about D.L.'s alleged motive to falsely accuse Galang of sexual assault may have been admissible under Rule 803(3), we find that any error in excluding the testimony was harmless. "A party must do more than simply show some technical error has occurred before he will be entitled to a reversal on the exclusion or admission of evidence; there must be some showing of prejudice." *Decatur v. State*, 324 So. 3d 1154, 1160 (¶18) (Miss. Ct. App. 2021) (quoting *Crump v. State*, 237 So. 3d 808, 816 (¶25) (Miss. Ct. App. 2017)). In the present case, Galang has failed to sufficiently show any prejudice that would require a reversal of his conviction and sentence.

¶29.    First, we recognize that in light of Galang's own admissions to Investigator Burnell, his text messages to D.L., and the other evidence and testimony the State presented at trial, the proof of Galang's guilt was overwhelming. *See Moberg*, 303 So. 3d at 824 (¶30) (recognizing an alleged evidentiary error was harmless where the proof of the defendant's guilt was overwhelming). In addition, despite the exclusion of S.L.'s testimony, the issue of D.L.'s alleged motive to falsely accuse Galang was, in fact, presented to the jury.

¶30.    Both D.L. and S.L. testified that prior to July 28, 2021, D.L. had explored the idea of seeking a court order that would grant her full custody of the son she shared with Galang.

13

Further, S.L. was allowed to testify that D.L.'s meeting with the attorney occurred and about her own personal observations that D.L. appeared angry and upset after the meeting. The jury also heard testimony that D.L. successfully obtained full custody of her son after Galang's arrest. Moreover, on cross-examination, Galang's attorney asked if D.L. could deny that after meeting with an attorney, she told S.L. the attorney had advised her that she "wouldn't be able to get full custody at this point because [Galang] had done nothing wrong[.]" In response to the questions from Galang's attorney, D.L. testified that she could neither recall nor deny making such a statement to her sister.

¶31. Upon review, we find that even without S.L.'s excluded testimony, evidence of D.L.'s potential motive against Galang was sufficiently presented to the jury. Further, Galang has failed to properly preserve the issue for appeal or to show that any prejudice resulted from the exclusion of the testimony. We therefore conclude that any error arising from the exclusion of S.L.'s testimony was, at most, harmless.

## CONCLUSION

¶32. Because we find no reversible error, we affirm Galang's conviction and sentence.

¶33. **AFFIRMED.**

**BARNES, C.J., CARLTON AND WILSON, P.JJ., WESTBROOKS, McDONALD, LAWRENCE, McCARTY AND EMFINGER, JJ., CONCUR.**